IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 80-319

THE STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

GENE ANDREW AUSTAD,

     Defendant and Appellant.

ORDER

FILED

MAR 25 1982

*Thomas J. Kearney*

CLERK OF SUPREME COURT
STATE OF MONTANA

PER CURIAM:

The following paragraphs are deleted from this opinion at page 17-18:

> "Before the adoption of the present Criminal Procedure Code, Title 46, MCA, this Court had relied upon section 94-8207, R.C.M., 1947, for its well-established rule that "prejudice in a criminal case will not be presumed, but rather must appear from the denial or invasion of a substantial right from which the law presumes prejudice . . . It is up to this court to decide whether an error affects the substantial rights of the defendant and the defendant must demonstrate prejudice from the record." State v, Straight (1959), 136 Mont. 255, 264-265, 347 P.2d 482, 488. Cf. State v. Bubnash (1963), 142 Mont. 377, 382 P.2d 830. This rule has been substantially adopted in such cases as State v. LaMere (1980), ____ Mont. ____, 621 P.2d 462, 465, 37 St.Rep. 1936, 1940, where we stated:

> "'This Court will not presume prejudice. If it did exist, it is incumbent on defendant to bring the evidence of prejudice before us (citation omitted). We find no reversible error in the judge's limitation [of voir dire questioning].'

> "Defendant's brief is silent as to prejudice resulting from the trial court's correction of its technical error. We see no prejudice. We find no reversible error in the inconsistent rulings of the trial court on for cause challenges to government employees."

The following paragraph is substituted for the above paragraphs:

> "Where, as here, the record shows that the
> trial court's error affected neither consti-
> tutional nor jurisdictional rights of the
> defendant, and defendant has failed to demon-
> strate prejudice to his substantial rights
> resulting from the error, this Court will not
> presume prejudice.  See State v. LaMere (1980),
> _____ Mont. _____, 621 P.2d 462, 465, 37 St.Rep.
> 1936, 1940.  We find no reversible error in
> the inconsistent rulings by the trial court
> on for cause challenges to government employ-
> ees."

As modified, the opinion stands; the petition for

rehearing is denied.

DATED this 25th day of March, 1982.

_____
Chief Justice

_____

_____

_____

_____

_____

_____
Justices

-2-

No. 80-319

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

GENE ANDREW AUSTAD,

Defendant and Appellant.

Appeal from:  District Court of the Eighth Judicial District,
In and for the County of Cascade
Honorable H. William Coder, Judge presiding

Counsel of Record:

For Appellant:

Daniel Donovan argued, Public Defender, Great Falls,
Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mary B. Troland argued, Assistant Attorney General,
Helena, Montana
J. Fred Bourdeau, County Attorney, Great Falls, Montana

Submitted:  November 30, 1981

Decided:    FEB 2 5 1982

Filed: FEB 2 5 1982

*Thomas J. Kearney*

---
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Gene Austad appeals from a jury verdict in the Eighth Judicial District Court, Cascade County, in which he was found guilty of deliberate homicide, aggravated robbery, sexual intercourse without consent, and aggravated burglary, all felonies. He was sentenced to life plus 120 years in prison and designated a dangerous offender. We affirm the District Court.

Defendant raises the following issues:

1. Whether the trial court erred in ruling that defendant was mentally and physically fit to proceed to trial.

2. Whether the trial court erred in admitting into evidence certain photographs of the victim.

3. Whether the trial court erred in refusing to grant defendant a change of venue.

4. Whether the trial court prejudiced the defendant by making inconsistent rulings on challenges for cause of prospective jurors.

5. Whether the trial court erred in allowing the State to present evidence of defendant's character and his prior felony conviction, ruling that he had "opened the door."

6. Whether the trial court erred in admitting into evidence State's exhibit No. 4 (the vest) and related expert testimony, over objections as to proper identification, foundation and chain of custody.

7. Whether the trial court erred in denying defendant's motion to take the depositions of expert witnesses of the State who lived out of state and refused to be interviewed by the defense over the phone.

-2-

8. Whether the trial court erred in giving instruction No. 14, which involved "flight of a person immediately after the commission of a crime."

9. Whether the trial court erred in its treatment of certain defense motions by failing to make rulings, failing to state specific grounds for its rulings, and reversing some of its earlier rulings without notice or without adequate notice.

Defendant raised a number of small issues; we will address those issues in their turn.

Facts and Procedures

At approximately 1:00 o'clock A.M. on April 22, 1978, two members of the Great Falls Police Department stopped a car for speeding. The driver (defendant) and a male passenger (Clifford Elliott) got out of the vehicle at the officers' request. On the pretext of getting his driver's license, defendant got back in the car, and sped off. The officers immediately gave chase, leaving the passenger behind. Defendant was observed throwing papers and various articles of clothing out the car window as he swerved through traffic on Tenth Avenue South, a main thoroughfare in Great Falls. The chase, which proceeded at about 90 M.P.H., ended when defendant lost control and crashed into several cars on the lot of a local car dealer. As a result of the wreck, defendant was comatose for weeks and spent months in the hospital. After his accident, he had and continues to have amnesia, some paralysis and muscle weakness, a speech impairment and other physical disabilities. He can walk with a walker but is usually confined to a bed or a wheelchair. His speech is coherent, but slow and occasionally difficult to understand.

At the time of the wreck, a police officer investigating the accident noticed many papers in the car, and could make out the name "Wald" on some of them. He suspected a burglary, and police were dispatched to the Wald address. There they found a broken window and a door slightly ajar. In the bedroom they found the naked body of 69-year-old Mabel Wald, badly beaten, with a butcher knife in her chest.

Further investigation revealed the following information. Among the items thrown out of defendant's car were bonds made out to Blaine and Mabel Wald and a vest containing glass particles similar to glass particles from the broken-out window of the victim's home, through which the initial entry was apparently made. Among the items inside the car were numerous articles belonging to the victim. Defendant's thumb print was found on a lamp in the victim's bedroom. The lamp was next to the victim's head, and its base was dented. Tire tracks in a nearby alley were similar to those defendant's car would have left. An autopsy on the victim (a widow) indicated recent sexual activity. The defendant, in the course of his job with a moving company, had helped the victim move into her home two days before she was murdered. At the time of the move, the victim had indicated twice in defendant's presence that she herself would move the strongboxes containing her currency.

Clifford Elliott was later apprehended and interrogated. His testimony revealed that at about 8:00 o'clock P.M. the night of the crime, in a Great Falls bar, defendant had offered to pay Elliott $100.00 to go to the home of a woman he had just moved, to steal some items. Elliott refused; when the defendant returned to the bar around midnight

-4-

wanting to show Elliott something in his car, Elliott accompanied him outside. There defendant showed him a purse, papers and a strongbox in defendant's car.

On April 27, 1978, defendant was charged by information with deliberate homicide, aggravated robbery, sexual intercourse without consent, and aggravated burglary.

Defendant was not served with a copy of the information until September 18, 1978, because the State feared the injuries he had sustained might interfere with defendant's ability to communicate and comprehend. He was arraigned on December 27, 1978, remaining silent, and a not guilty plea to all charges was entered in his behalf.

In February of 1979, defendant was released from the hospital. His bail was reduced, permitting him to be taken to the home of his parents where he would be given the personal care then indicated by his condition.

Defendant moved for change of venue, sequestration of prospective jurors during voir dire examination and during trial, and individual voir dire examination of prospective jurors. Individual voir dire was granted. On August 24, 1979, following a series of psychiatric and medical examinations of defendant to determine his fitness to proceed, the District Court held an _in camera_ hearing to determine defendant's fitness to proceed to trial, his ability to assist and communicate with his counsel, and the extent to which the State's evidence could be reconstructed.

On October 2, 1979, the District Court found the defendant capable of proceeding to trial and set a trial date of November 20, 1979. Because of defendant's condition, trial was to be held for no more than four hours per day.

On November 1, 1979, defendant's motion to close pretrial proceedings was granted. Individual voir dire

examination of prospective jurors began on December 3, 1979, closed to the press and public. During voir dire, the District Court granted a motion by the defense that defendant serve as co-counsel. On December 14, 1979, the Great Falls Tribune obtained a writ of supervisory control in this Court, regarding the exclusion of press and public. This Court stayed proceedings until January 18, 1980, when, after oral argument was heard, we vacated the District Court's order excluding press and public from voir dire proceedings. See Great Falls Tribune v. District Court (1980), ____ Mont. ____, 608 P.2d 116, 37 St.Rep. 502.

Jury selection resumed on January 24, 1980, and the evidentiary stage of the trial began on February 19, 1980. The jury returned a verdict of guilty on all counts, March 6, 1980, and on May 2, 1980, the District Court sentenced defendant to a total of life plus 120 years. Defendant appeals.

## I.

Defendant argues that the trial court should have found him unfit to stand trial because his amnesia rendered him incapable of assisting in his own defense. He claims he could not reconstruct events which occurred the night of the crime, could not develop a defense of alibi or proof of another person's guilt, and could not testify effectively in his own behalf. Finally, he argues that the trial court erred in not meeting the standards established in Wilson v. United States (D.C.Cir. 1968), 391 F.2d 460. According to defendant, the least this Court can do is remand for a Wilson-type post-trial hearing.

In Wilson, the Circuit Court of Appeals set out a

number of criteria to be applied before and after trial to determine whether an amnesiac criminal defendant could and did receive a fair trial. Wilson is not a Ninth Circuit decision. Nor have those federal courts dealing with the competence of amnesiac criminal defendants in the decade after Wilson adopted the Wilson standard, relying instead upon the less stringent test established in Dusky v. United States (1960), 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824. For those reasons, we decline to adopt the Wilson standard in Montana, finding the Dusky standard to be sufficient.

In Dusky, the United States Supreme Court stated:

> "[The] test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. at 402, 80 S.Ct. at 789, 4 L.Ed.2d at 825.

The Dusky standard has been applied in the majority of federal cases in which a criminal defendant claimed amnesia rendered him unfit to stand trial; none of the federal courts, including the Wilson court, has held that amnesia per se constitutes incompetency. See United States v. Mota (5th Cir. 1979), 598 F.2d 995, 998, cert. denied sub. nom. Flores v. United States (1980), 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770; United States v. Swanson (5th Cir. 1978), 572 F.2d 523, 525-526, cert. denied (1978) 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152; United States ex rel. Parson v. Anderson (3d. Cir. 1973), 481 F.2d 94, 95, cert. denied sub. nom. Parson v. Anderson (1973), 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479; United States v. Sullivan (2d Cir. 1969), 406 F.2d 180.

The record indicates that several physicians and psychiatrists interviewed, tested, and studied the defendant over a period of many months and testified at the fitness hearing. They were in agreement that defendant's amnesia was not feigned: he could not remember events which occurred the day of the crime and could not testify about his mental state at that time. But they were also in substantial agreement that defendant was (1) capable of understanding the facts of the case, the nature of the charges against him, and the procedural and legal issues involved; (2) capable of comprehending counsel and making rational and informed decisions upon counsel's advice; (3) capable of communicating rationally and coherently, despite a small speech problem. The District Court judge noted that defendant was alert, oriented, and fluent throughout the competency hearing. Indeed, during voir dire, for a time, defendant was named co-counsel. There is sufficient evidence of competency here to support the District Court's discretionary ruling that defendant was fit to proceed to trial.

In United States ex rel. Parson v. Anderson, 481 F.2d at 96, the Third Circuit Court of Appeals noted:

> "Had the proof of Parson's commission of the crime been based on eyewitness testimony or had the prosecution relied substantially on statements attributed to Parson, his amnesia might have significantly hindered the preparation and presentation of a rebuttal defense. No such evidence was presented here. Rather, the evidence was of a physical nature. Thus, it would appear that the amnesia did not meaningfully affect the availability of this type of defense [insanity or rebuttal of state's evidence]."

Here, also, the bulk of the evidence against defendant is physical evidence, which would not be significantly affected by defendant's amnesia: the victim's possessions

in defendant's car; tire tracks similar to those from his car just outside the victim's home; particles of glass similar to glass from victim's window imbedded in defendant's vest; defendant's fingerprints on a lamp that was apparently used to club the victim. Defendant's mental state and his "alibi" would have little effect upon this evidence.

Furthermore, the defendant was given a good deal of assistance by the court and by the prosecution. The State's files were opened to him; experts were appointed by the court; the State's experts were urged to cooperate with defendant.

Finally, the circumstantial evidence against defendant was very strong. In addition to the physical evidence mentioned above, the jury considered defendant's having helped move the victim two days before her murder; defendant's offer to Clifford Elliott to pay him for helping rob an old lady he'd moved earlier; defendant's uncharacteristic wild and jubilant behavior in a bar at a time estimated to be just after the murder; defendant's flight from the police after a routine traffic stop.

A number of the above reasons were included in the Wilson standard as supporting a determination by the trial court that defendant would be unlikely to be prejudiced by standing trial, despite his amnesia. The trial court did not err in finding that, under the Dusky standard, defendant was competent to stand trial.

Defendant also argues that, because he suffers from cerebral palsy (apparently as a result of injuries sustained in the accident), he is developmentally disabled under section 53-20-102, MCA, and the trial court erred in not finding him unfit to stand trial. Defendant relies upon section 46-14-221(3), MCA, which states in relevant part:

-9-

"If the court determines that the defendant lacks fitness to proceed due to the fact that the person is developmentally disabled, as defined by 53-20-102, the proceeding against him shall be suspended. . ."

We are aware that a physical condition may be determinative of fitness to proceed. We do not question whether defendant has cerebral palsy, or whether he is, by definition, developmentally disabled. We do point out to defendant that section 46-14-221(3), MCA, does not say that a developmental disability automatically mandates a finding of lack of fitness to proceed to trial. A developmental disability may affect a defendant in such a way as to render him unfit to proceed. That is for the trial court, in its discretion, to determine. Here, the trial court has found defendant fit to proceed despite his developmentally disabled condition, a finding amply supported by medical evidence. The trial court's decision was in no way inconsistent with the provisions of section 46-14-221(3), MCA.

It is evident to this Court that the District Court did not err in holding that defendant was competent and fit to stand trial.

## II.

On January 22, 1980, the District Court judge granted defendant's motion in limine to exclude photographs of the victim finding them "neither necessary nor instructive with regard to any material fact or condition of this case," besides being unduly prejudicial. The State filed a motion to reconsider, and a hearing followed, in which the State suggested the photographs could be made less inflammatory by cropping. The court did not rule, and, when the State presented the pictures, uncropped, at trial, the defendant moved for mistrial. The court denied the motion and admitted

the photographs into evidence.

Defendant now argues that the use of the photographs inflamed and prejudiced the jury and, by denying defendant a fair trial deprived him of due process of law. He relies upon a number of Montana cases which hold that allowing the introduction of unnecessary, gruesome photographs for the purpose of arousing prejudice against the defendant is reversible error. See State v. Azure (1979), ____ Mont. ____, 591 P.2d 1125, 36 St.Rep. 514; State v. Pendergrass (1978), 179 Mont. 106, 586 P.2d 691; State v. Bischert (1957), 131 Mont. 152, 308 P.2d 969.

We do not find reversible error here. The hearing for reconsideration of the court's exclusionary ruling should have prepared defendant for the possibility that the pictures would be admitted into evidence. We do not approve the District Court's failure to rule, but neither do we find that failure to have prejudiced defendant's right to a fair trial. In State v. Mackie (1981), ____ Mont. ____, 622 P.2d 673, 674, 38 St.Rep. 86, 88, this Court stated:

> "The longstanding rule in Montana is that
> a photograph is admissible if it 'fairly
> and accurately represents relevant evidence.'
> State v. Jones (1914), 48 Mont. 505, 139
> P. 441. It is within the discretion of
> the trial court to allow into evidence
> duly verified photographs to aid the jury
> in its fact-finding process. Fulton v.
> Chouteau County Farmers' Co. (1934), 98
> Mont. 48, 37 P.2d 1025."

See also State v. Hoffman (1982), ____ Mont. ____, ____ P.2d ____, 39 St.Rep. 79, 82-83.

There were two photographs admitted into evidence, one of the entire body of the victim as she was found in her home, one of the head and neck of the victim at the time of autopsy. The first photo shows a broken lamp alongside the

victim's head. This was the lamp bearing the defendant's fingerprints. Defendant argued that his fingerprints could have been placed on the lamp when he helped move the victim several days earlier. The State needed the photograph to support its argument that the position of the print on the lamp was more consistent with its use as a bludgeon than with the defendant's having merely carried it from one place to another. The position of the lamp, the way the lamp was broken and dented, and the location and nature of the bruises on the victim's head, all supported the State's argument. The first photograph also showed a singular lack of blood on the victim's body and on the bedclothes. Defendant had contended that if he had committed the murder, he would have had blood on his clothing. The State needed the photograph to disprove defendant's contention. We fail to see how the photograph could have been effectively cropped and yet have been useful for that part of the State's argument. The second photograph shows the location of wounds on the victim's head and neck after the blood had been washed away and the victim's head partially shaved. The State used that photograph to show, again, how the lamp must have been held to strike the victim, and to show that the wounds on the victim's neck could have been inflicted by the knife with which she was ultimately killed.

We are aware that these photographs indicate the brutality and viciousness of the crime, and could result in some prejudice to the defendant. We are not willing, however, to accept defendant's argument that testimony and a plastic mannikin with red lines drawn on it to indicate wounds sufficiently enlightened the jury that the photographs were unnecessary. We will not demand that a trial be sanitized

to the point that important, probative evidence must be excluded. In State v. Fitzpatrick (1973), 163 Mont. 220, 229-230, 516 P.2d 605, 611, we stated:

> "Once this relevance is established, the fact that a photograph may be inflammatory should not render it inadmissible any more than inflammatory word descriptions should render testimony inadmissible, so long as the purpose is probative and the true facts and conditions are described. Jones on Evidence, 6th Ed., Vol. 3, Sec. 17:50 (1972)."

The trial judge, in his discretion, must determine whether the probative value is outweighed by potential prejudice. State v. Azure, supra. We find no abuse of discretion in the trial court's admitting the two photographs into evidence.

### III.

On May 24, 1979, defendant requested a change of venue, claiming that pretrial publicity had created such prejudice that fair trial could not be had in Cascade County. The trial court failed to rule on defendant's motion, although defendant raised the matter several times before trial began. Voir dire revealed that most, if not all, of the jurors actually chosen were familar with certain facts of the case. Defendant argues that, despite the jurors' assurances on voir dire that they would grant defendant the presumption of innocence and consider only the evidence presented at trial, the jurors were in fact, so prejudiced, consciously or unconsciously, as to preclude a fair trial.

The State concedes that most prospective jurors had some knowledge of the crime because of the publicity and a good many of those excused for cause had already formed opinions as to the guilt of the defendant. But the State maintains that is not sufficient to establish the existence of prejudice, or to require a trial court to grant a motion for change of venue.

-13-

Montana is no longer ruled by the old standard requiring a showing that fair trial is impossible in the jurisdiction due to publicity before a change of venue will be granted. See State ex rel. Hanrahan v. District Court (1965), 145 Mont. 501, 508, 401 P.2d 770, 774. In State v. Link (1981), ____ Mont. ____, ____ P.2d ____, ____, 38 St.Rep. 982, 985, this Court agreed that the old rule set an unworkably high standard and adopted the "Illinois rule" articulated in People v. Berry (1967), 37 Ill.2d 329, 226 N.E.2d 591, 592-593, which states:

> "[T]he rule is that an accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial."

This Court in Link indicated that the effect of the adoption of the Illinois rule was to allow a district judge to "exercise his discretion in determining that the actual prejudice is sufficiently pervasive to warrant a change of venue." 38 St.Rep. at 985. Link also stated that "where the evidence is inconclusive on the issue of prejudice, the district judge's discretion should be relied on. His ruling should not be disturbed unless an abuse of discretion is shown." 38 St.Rep. at 984.

In Great Falls Tribune v. District Court (1980), 608 P.2d 116, 119-120, 37 St.Rep. 502, 506, referring to the pretrial publicity in this case, this Court stated:

> "We have examined the 92 exhibits of pretrial media coverage. We note that the Tribune has published and republished the background of the case -- that defendant is charged with raping and murdering the 69 year old victim, cutting her throat, sticking a knife in her chest and subsequently being apprehended by police after a high speed chase. Television and radio

broadcasts are of the same tenor.  In our view these items are factual reporting without editorializing and are no more inflammatory than background information on any other brutal crime."  (Emphasis supplied.)

". . .

"In the modern world it is impossible to create an artificial, antiseptic environment from which prospective jurors may be drawn who have heard nothing of a serious crime committed in their midst . . .  It is only where they form fixed opinions on the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict based solely on the evidence presented in court that they become disqualified as jurors."  (Citations omitted.)

Here, there was extensive voir dire, which amounted to 2,000 pages of transcript and which was designed to ferret out any possible prejudice in prospective jurors.  Those jurors whose responses indicated a belief that defendant was guilty, or betrayed prejudice against defendant for any reason, were promptly excused by the court.  Those jurors who were accepted had all been passed by the defense and had all testified that they were without any opinion as to defendant's guilt and could base their verdict solely upon the evidence presented at trial.  In light of the latitude granted the defense in voir dire, and after consideration of the pretrial publicity and this Court's determination that it was not prejudicial, we find that the District Court did not abuse its discretion in holding trial in Cascade County.  We will address the court's failure to rule elsewhere in this opinion.

IV.

The defendant's fourth allegation of error is that the trial court gave the prosecution an undue advantage in jury selection by ruling inconsistently on challenges for cause.

-15-

During voir dire, the trial judge excused a biased county employee challenged for cause by the defendant, and excused a State employee challenged for cause by the prosecution, because of their employment. Subsequently, two challenges for cause by the defendant were denied, although one prospective juror worked for Cascade County and another was a recently retired State employee. The first two challenges were granted because of the court's mistaken belief that section 46-16-304(2)(b), MCA, applied to government employees. The defendant's challenge to the former State employee was summarily denied because he was retired. The defendant's challenge to the Cascade County employee, who had previously been passed, was denied because the trial court, after consideration of the statute and relevant cases, concluded that section 46-16-304 (2)(b) referred only to relationships between the defendant, the victim, and the complainant. The early challenges were incorrectly granted on the basis of government employment. The first prospective juror listed above was excused because of her bias, as well as her employment, and was properly excused. The defendant now argues that because the prosecution was allowed an improper challenge for cause, it did not need to use a peremptory challenge to excuse that prospective juror, and effectively enjoyed an advantage over the defendant when it came to the exercise of peremptory challenges.

Defendant has not attempted to prove that prejudice resulted from the trial court's error. He argues instead that the failure of the trial court either to call back the prospective juror erroneously excused, or to allow the defendant to excuse a prospective juror for the same defective

-16-

reason, gave the prosecution an undue advantage in its exercise of challenges.

We agree with the defendant that the trial court improperly excused the State employee, and that the State was given a slight advantage in the exercise of its challenges by reason of the trial court's recognizing its error in time to deny the defendant's challenge for cause of the Cascade County employee. But defendant has failed to show this Court how the error prejudiced him.

In State v. Bashor (1980), ____ Mont. ____, 614 P.2d 470, 477, 37 St.Rep. 1098, 1104 (challenge to entire jury panel), we stated:

> "The pertinent inquiry is, however, whether the jury as empaneled were able to render an impartial judgment based solely upon the evidence presented at trial."

Here, as noted above, the prospective jurors were extensively examined to determine whether they were prejudiced against the defendant. Those persons exhibiting bias were promptly excused for cause. The cooperation of the trial court and the prosecution in this process is evident in the transcript. Those jurors who were empaneled had given assurances of impartiality, and defendant has presented no evidence that they were partial.

Section 46-20-702, MCA, provides:

> "Any error, defect, or irregularity, or variance which does not affect substantial rights shall be disregarded. Defects affecting jurisdictional or constitutional rights may be noticed although they were not brought to the attention of the trial court."

Before the adoption of the present Criminal Procedure Code, Title 46, MCA, this Court had relied upon section 94-8207, R.C.M., 1947, for its well-established rule that

-17-

"prejudice in a criminal case will not be presumed, but rather must appear from the denial or invasion of a substantial right from which the law presumes prejudice . . . It is up to this court to decide whether an error affects the substantial rights of the defendant and the defendant must demonstrate prejudice from the record." State v. Straight (1959), 136 Mont. 255, 264-265, 347 P.2d 482, 488. Cf. State v. Bubnash (1963), 142 Mont. 377, 382 P.2d 830. This rule has been substantially adopted in such cases as State v. LaMere (1980), ____ Mont. ____, 621 P.2d 462, 465, 37 St.Rep. 1936, 1940, where we stated:

> "This Court will not presume prejudice. If it did exist, it is incumbent on defendant to bring the evidence of prejudice before us (citation omitted). We find no reversible error in the judge's limitation [of voir dire questioning]."

Defendant's brief is silent as to prejudice resulting from the trial court's correction of its technical error. We see no prejudice. We find no reversible error in the inconsistent rulings of the trial court on for cause challenges to government employees.

V.

The defendant took the stand on his own behalf, and during cross-examination, the following dialogue took place:

> "Q. Did you kill Mabel Wald?
>
> "A. No.
>
> ". . .
>
> "Q. Mr. Austad, you've already testified you don't remember what happened in January, February, March and April of 1978. You've also testified that you did not kill Mabel Wald. How do you know?
>
> "A. I just know what I'm made of, and what I think what I would do, and what I think -- Mrs. Wald was an elderly lady, and I wouldn't even think of committing any kind of offense toward an old lady or anyone."

An *in camera* hearing followed, in which the trial court ruled that defendant had "opened the door" to character evidence and evidence of a prior felony conviction for burglary. Defendant's objections were noted, and cross-examination continued. The following exchange took place:

"Q. Did you burglarize Mabel Wald's house?

"A. No.

"Q. How do you know?

"A. I don't -- because it is not part of me to do that type of thing. I've been in trouble with the law before, but I've never burglarized any place.

"Q. Have you ever been convicted of a felony?

"A. Yes.

". . .

"Q. What was the conviction for?

"A. Burglary." (Emphasis added.)

The State brought in a rebuttal witness, Margaret Fasbender, who was a high school English teacher in Fairfield, where defendant was raised. Ms. Fasbender testified that defendant's reputation for truth and honesty was "rather dubious;" he was considered "untrustworthy." In response to a question about defendant's reputation for peacefulness, Ms. Fasbender replied, "He was felt to be rather volatile and temperamental."

Defendant now argues that the trial court erred by permitting the State to introduce prejudicial evidence concerning defendant's character and his previous felony conviction. Defendant relies upon Rules 609 and 404 of the Montana Rules of Evidence.

Rule 404(a) states:

"Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

"(1) Character of accused. Evidence of a
pertinent trait of his character offered
by an accused, or by the prosecution to
rebut the same."

Defendant argues that, because the State asked the question

that elicited defendant's remarks about his character, those

remarks were technically not "offered by the accused" as

contemplated in Rule 404(a)(1), and cannot be used as a

basis for admitting other character evidence.

We are not persuaded. Defendant was not required to

answer as he did; his answer was an assessment of his own

character and a declaration that he could not "even think

of" doing such a thing to an old woman. His answer, despite

the fact that it was elicited by a question from the State,

was clearly an offer of a pertinent trait of his character.

As such, it comes within the exception of Rule 404(a)(1),

and opens the door for the State to present rebuttal evi-

dence of a pertinent trait of the character of the accused.

Defendant relies upon State v. Cor (1964), 144 Mont.

323, 396 P.2d 86, to support his argument that evidence of

his reputation for truth and veracity is irrelevant in a

homicide case. We remind defendant that this is also a

burglary case, a robbery case, and a rape case. The evidence

which was admitted concerning defendant's reputation for

truth and veracity and for peacefulness was relevant. We

find that the rebuttal character evidence was properly

admitted.

Defendant, on cross-examination, claimed to have never

burglarized any place, then, reluctantly admitted to a

burglary conviction. Because it is defendant's perjured

claim which determines the admissibility of the evidence of

his burglary conviction, we need not consider the propriety

of the trial court's earlier ruling that defendant's testimony putting his character into issue also opened the door to evidence of the burglary conviction.

Defendant argues that the evidence of his burglary conviction was introduced to impeach his credibility and convince the jury of his guilt, and as such should not have been admissible. He relies primarily upon Rule 609 and Rule 404(b), M.R.Ev., which state:

> "For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is not admissible." Rule 609, M.R.Ev.

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Rule 404(b), M.R.Ev.

We remind defendant that the list of exceptions in 404(b) is not exclusive. The Commission Comment following Rule 404(b) in the Montana Lawyer's Rule Book states:

> ". . . Montana law is consistent with the concept that purposes other than those listed in the rule may be found and used to admit evidence of other crimes."

Here, the evidence of defendant's prior felony conviction was admitted to prove not that defendant committed the crimes of which he was charged, but that defendant had lied under oath.

The Commission Comment following Rule 609 indicates that the purpose of that rule is to prevent opponents from discrediting all the testimony of a witness or party simply by presenting evidence of other crimes. The Commission states that the rule springs from a concern that witnesses will be caused undue pain and embarrassment, even discouraged

from testifying, although the prior conviction may have no relation to credibility.

The circumstances here are obviously not those contemplated by Rule 609 or by the line of case law in Montana which establishes certain standards which must be met before and after admission of other crimes evidence, before such evidence will be acceptable. See State v. Just (1979), _____ Mont. _____, 602 P.2d 957, 36 St.Rep. 1649; State v. LaVe (1977), 174 Mont. 401, 571 P.2d 97; State v. Heine (1975), 169 Mont. 25, 544 P.2d 1212; State v. Jensen (1969), 153 Mont. 233, 455 P.2d 631. Here, on cross-examination, defendant answered a question with an unnecessary, self-serving statement which he knew to be untrue, intended to place him in a better light with the jury. The fact that the evidence of his prior felony conviction was not elicited by defense counsel and the fact that disclosure of his false testimony and his conviction were somewhat prejudicial to the defendant, are not controlling here. The Rules of Evidence were not intended to muzzle the State against defendant's deliberate attempts to mislead jury members by lying to them in answering specific questions. The trial court did not err in admitting Ms. Fasbender's rebuttal testimony and defendant's own testimony that he had been convicted of burglary.

VI.

During defendant's trial and over defendant's objection, a tan vest was admitted into evidence and expert testimony by an F.B.I. agent established that glass particles found imbedded in the vest shared certain physical properties with glass taken from the broken window and the bedsheet in the victim's house. The F.B.I. expert stated that there was "a slim possibility" that the glass on the vest came from some

source other than the window of the victim's house.

Defendant now alleges that the court failed to rule on his motion to suppress the vest and evidence about the vest unless and until a proper chain of custody could be established. The transcript reveals that the defendant believed the court had denied the motion in limine. Defense counsel stated to the court:

"It's been the defense's impression that you have ruled against our motion in limine to require the State to establish a chain of evidence on the vest outside the presence of the jury."

In his brief, defendant also admits that the court orally denied defendant's motion to suppress the vest and other evidence, just before opening statements of counsel, and filed the denial as written order No. 213. Having acknowledged and accepted the rulings, the defendant cannot now in good faith claim to have been prejudiced by the court's "failure to rule" in this matter.

Defendant's objections to the admission of the vest and testimony regarding it arose from conflicting testimony at the suppression hearing and inconsistent claims by certain officers as to when, how, and by whom the vest was seized, bagged and tagged as evidence. The defendant argues that the State has failed to establish that (1) the vest was connected with the crime, and (2) the vest was not contaminated by glass after it was put with the other evidence in this case.

Officer Meddock (and his partner Officer Sinnott) testified both at the suppression hearing and at trial that Meddock had picked up the vest and other clothing along the chase route on River Road minutes after they heard of the chase

on their police radio; that the items picked up were bagged and tagged immediately upon the officers' return to the police station and were left in the police lab. Meddock testified that the clothing was dry although the night was damp. There is some confusion in the officers' testimony as to which of them bagged and tagged the vest, but both agreed that it was placed in an evidence bag at police headquarters very early on the morning of the accident. The tag on the bag containing the vest is written and signed by Officer Sayer, who was in charge of the police lab at the time. Sayer was uncertain how the vest got into the police lab, stating at different times that he thought the vest had been handed to him at the scene of the crime and that the vest was seized at the hospital. Evidence from other sources strongly indicates that no vest was taken from the hospital and this vest was the only one in evidence in the case.

Sayer admitted at the suppression hearing and trial, that it was possible someone had brought the bag to the police lab, bagged and tagged it, and that he had changed the tag to meet F.B.I. acceptance standards, as he customarily did. There is no evidence on the record to indicate Sayer changed the bag as well as the tag; and F.B.I. agent McGinnis testified that the evidence bag containing the vest was "sealed" when he received it.

At trial, three witnesses identified the vest by recollection. Officer Meddock identified the vest, apart from tags and numbers, as the one he'd picked up with other clothing from River Road. He recognized it because it was a J.C. Penney snap-front vest with "a red substance on it

right across the front." He also testified that the clothing was dry when he picked it up ("Hadn't been laying there very long.") and the shirt, vest and shoe were within a few feet of each other along a course strewn with boxes and papers bearing the name Wald. Officer Sinnott stated, "This appears to be the vest that . . . Officer Meddock had picked up. . . [A]t the station I tagged this garment, and I remember seeing what appeared to be like blood on the vest here, it seems to -- the stain's still here." Finally, F.B.I. Agent McGinnis testified that the vest was the same one that "arrived sealed in a plastic bag." The testimony of these men is sufficient to establish the identity of the vest and its relation to the crime.

Thus, there is strong evidence from Officers Sinnott and Meddock that the vest was picked up along the chase route and was immediately bagged and placed in the police lab well before Officer Sayer arrived there with the evidence he had bagged and tagged at the victim's home, i.e., the bedsheet, window glass and other items. Officer Sayer testified that he mailed the bagged evidence to the F.B.I. lab. Agent McGinnis testified that the vest was still protectively bagged when it reached the F.B.I. lab. We are not persuaded by defendant's speculation that the bagged glass could somehow have contaminated the bagged vest. Our skepticism is increased by the F.B.I. expert's testimony that the material of the vest was so smooth and closely-woven that glass particles would not easily have become imbedded in it. Nor do we accept that the officers' failure to remember who tagged the vest implies that someone altered the sealed bag or tampered with the vest.

In State v. Close (1981), ____ Mont. ____, ____, 623

P.2d 940, 947-948, 38 St.Rep. 177, 186, this Court stated:

> "The general rule concerning chain of evidence foundation is this:
>
> "'The State must identify the particular exhibit as relevant to the criminal charge and must show prima facie that no alteration or tampering with the exhibit has occurred . . . Once that has been done, the burden of proving alteration shifts to appellant. . .' State v. Burtchett (1974), 165 Mont. 280, 287, 530 P.2d 471, 475. (Emphasis added.)"

And in State v. Nelson (1978), 178 Mont. 280, 288, 583 P.2d 435, 439, we approved the State's argument:

> "'It was not incumbent upon the state to prove that it could not have been tampered with. It was not necessary that all possibility of its having been tampered with should be excluded by affirmative testimony. [Citation omitted.] It was only necessary to identify the package, and to make prima facie showing that there has been no substantial change in it to warrant its introduction into evidence.' State v. Wong Fong (1925), 75 Mont. 81, 87, 241 P. 1072, 1074." Cf. State v. Rumley (1981), ____ Mont. ____, 634 P.2d 446, 449, 38 St.Rep. 1351A, 1351D.

We find that the State made a prima facie showing that the vest was not substantially changed after it was seized, and that defendant failed to subsequently meet his burden of proving alteration.

Determining adequacy of foundation is within the trial court's discretion. State v. Armstrong (1980), ____ Mont. ____, ____, 616 P.2d 341, 355, 37 St.Rep. 1563, 1579. We find no abuse of discretion.

## VII.

Defendant claims that the trial court's denial of his repeated requests to depose the State's expert F.B.I. witnesses in Washington, D.C., deprived him of his right to confront witnesses and his right to adequate representation by counsel. The trial court denied both defendant's request for in-person deposition and his request for deposition by written

-26-

interrogatories under oath. The record indicates that attempts by the defendant to question the F.B.I. witnesses by telephone had been unsuccessful because of F.B.I. restrictions on the dissemination of information by telephone.

Sections 46-15-201(1) and 202(2), MCA, provide that the trial court may order the deposition of a material witness in person or by written interrogatories when the witness is a non-resident who refuses to provide relevant information and "it is necessary to take his deposition in order to prevent a failure of justice." The statutes are obviously discretionary. The Commission Comment to sections 46-15-201 and 202, MCA (Annotations), refers to "the limited use of depositions in criminal cases," and states that "they are only to be used when the state or defendant needs a deposition to avoid the loss of a witness material to the case."

The F.B.I. witnesses were to testify at trial; they would be subject to cross-examination by the defendant. The trial court indicated that defendant could request a continuance to allow him to meet the testimony of the F.B.I. experts; defendant made no request for a continuance. The State had allowed defendant access to its files, including the F.B.I. reports, and had released certain evidence to the defendant, e.g., the vest, the bedsheet, and glass particles from the victim's window. The court had appointed a glass expert and a crime scene expert, who could aid defendant in analyzing the evidence.

Clearly, there was no danger that the F.B.I. witnesses would be lost to the defendant. Furthermore, defendant had access to physical evidence, information and expert help, which would allow him to adequately cross-examine the F.B.I. witnesses. Defendant chose not to ask for a continuance.

We find no abuse of discretion and no evidence of prejudice. No error.

## VIII.

Over defendant's objection, and after rejecting defendant's more extensive instruction on flight, the trial court gave the following instruction:

> "The flight of a person immediately after the commission of a crime, or after he is accused of crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

Defendant now alleges that the words "immediately after the commission of a crime" suggested to the jury that the high speed chase began at the victim's home just after the homicide. Defendant also argues that this instruction must be considered together with the acknowlegement by the trial court in the Great Falls Tribune case, supra, that the media covering this crime "lead the public, and prospective jurors, to the conclusion that the chase came about as a result of the discovery of the slaying and attempt to escape from the scene by the accused." According to the defendant, under the circumstances, the instruction could have caused the jury to ignore other explanations offered by the defendant for his flight. We find no reversible error in the giving of the instruction.

The transcript reveals that the evidence presented at trial firmly established, not once, but many times, that the chase began after a routine traffic stop approximately an hour after the homicide and some distance from the victim's residence. The State, in its closing argument, several times drew the jury's attention to the "routine traffic

-28-

stop" on River Road, at a time when no one in Great Falls knew that something had happened to Mabel Wald. In fact, much of the State's emphasis on closing was that it was the wild flight after an unimportant stop by police that gave rise to the inference that defendant was guilty of more than speeding or a faulty taillight. The State also argued in closing that defendant returned to the Elbow Room Bar after the homicide and before the chase. Finally, the defense itself, in closing argument, several times emphasized the circumstances of the chase. At one point, defense counsel said to the jury:

> "The State would have you believe the high-
> speed chase started immediately after the
> homicide of Mabel Wald. We know that's not
> so. It didn't originate from the scene of
> the homicide; it originated from River Road."

Technically, the instruction was incorrect; defendant did not flee from the police immediately after the crime. He did, however, flee so shortly after the time the crime was committed that flight would have been a reasonable response to the traffic stop if he had committed the crime. The jury was instructed that they could consider flight along with other circumstances in determining defendant's guilt or innocence. Considering the many references to and explanations of the time and place of the flight, we do not think any reasonable juror would have been misled by the instruction.

This Court has held that error in instructing the jury constitutes harmless error when "the offensive instruction could not reasonably have contributed to the jury verdict." State v. Hamilton (1980), _____ Mont. _____, _____, 605 P.2d 1121, 1132, 37 St.Rep. 70, 82-83, cert. denied (1980), 447 U.S. 924, 100 S.Ct. 3017, 65 L.Ed.2d 1117. This emphasis

upon the possible impact of an improper instruction upon a reasonable jury is consistent with Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. See also State v. Sandstrom (1979), ____ Mont. ____, 603 P.2d 244, 36 St.Rep. 2099 (constitutional error in instructions).

We need not find that the entire instruction had no influence upon the jury; it is reasonable to assume that they considered the implications of defendant's dramatic flight. But we do find that the part of the instruction which was technically incorrect could not reasonably have contributed to the verdict. No error.

## IX.

Defendant claims that he was denied due process, effective assistance of counsel and a fair trial because the trial court failed to properly rule on a number of defendant's motions, before, during, and after trial. He alleges fifteen instances of the court's failure to rule at all, or ruling without stating grounds or without providing notice.

Many of the alleged instances of judicial error in ruling have been discussed above, and we have held either that the defendant was aware or should have been aware of the trial court's position, or that the defendant has failed to show prejudice, and the error, if any, was harmless. We held that Wilson v. United States, supra, was not controlling in this state, and the trial court's failure to grant defendant's motion for a Wilson-type post-trial hearing was not error. The remainder of defendant's charges of error are unsupported by facts and law and are devoid of any showing of prejudice to the defendant. We decline to consider such "bald assertions" of error. McGuinn v. State (1978), 177 Mont. 215, 581 P.2d 417.

We emphasize that we in no way approve of or countenance the failure of a trial court to properly rule upon defendant's motions. Were there an adequate argument presented by defendant showing prejudice or constitutional error and supported by authority, such a failure could well result in reversal.

## X.

Defendant raises a great many mini-issues, often stated in one or two sentences, with little or no reference to relevant facts and applicable law. Such a "shotgun" approach serves no useful purpose and may tend to obfuscate legitimate issues by peppering them with irrelevant asides. It is not the function of this Court to research and argue issues for counsel. Wherefore, when such issues are raised, we will address them briefly, if they warrant consideration at all.

Defendant raises a one-sentence allegation that his right to speedy trial was denied. We disagree. More than nineteen months elapsed between the time the information was filed and the time voir dire began, easily enough to raise the type of inquiry mandated by Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, and its many progeny in Montana. A review of the record, however, indicates that most, if not all, of the delay in this case was attributable to efforts by the parties and the District Court to ascertain defendant's fitness to stand trial, or to consideration by the court of defendant's barrage of pretrial motions. Both the State and defendant pressed for speedy trial during the lengthy pretrial proceedings. Ordinarily, prejudice will be presumed in the event of unreasonable delay of trial by the State. Here the State was not primarily responsible for the delay, and if anything, the delay worked to the advantage of

defendant, whose physical and mental improvement for some months after the accident is noted in the record. We find no error here.

Defendant claims the trial court stated, on July 9, 1979, that he was unfit to proceed to trial, then, without explanation, reversed that ruling in October and found him fit to proceed; and such a reversal was one of many arbitrary actions by the trial court which resulted in the denial of a fair trial. Defendant's argument is disingenuous.

The trial court stated, in its July 9, 1979, order:

> ". . .[T]he accused lacks Fitness to Proceed within the meaning of that term as used in Sec. 46-14-221, et seq., M.C.A., and accordingly, further proceedings in this case are STAYED for the reasons, and upon the terms and conditions hereinafter set forth."

Those "terms and conditions" included continuance of trial date and a request by the court for further evaluations and arguments as to the physical and psychological condition of the defendant. The transcript of a separate hearing held on July 16, 1979, contains arguments by counsel regarding the meaning of the July 9, 1979, order, followed by this statement from the court:

> "I am not persuaded. . . that the court's order was a declaration that Mr. Austad was unfit to proceed. I think the requisite of that order, and the proceedings which the court has ordered, was to make some factual determination of Mr. Austad's fitness to proceed to trial. . . If I had made the finding that he was unfit to proceed pursuant to statute, then as [the State] pointed out, the court would have had to make some disposition of the defendant, pending the overcoming of these disabilities.
>
> "What we're engaged in now are those hearings which will make finally a determination of whether Mr. Austad is fit to proceed. . ."

Defendant cannot in good faith argue that he was unprepared for the October ruling of the court that defendant was fit

-32-

to proceed to trial. There is no error here.

While defendant does not number among his issues a challenge to the sufficiency of the evidence presented, he devotes a number of pages to an argument that the case against him was circumstantial and "left 15 reasonable doubts," which he lists. We point out to defendant that the correct test here is whether there is substantial evidence supporting the conviction when that evidence is viewed in the light most favorable to the State, substantial evidence being such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. State v. Wilson (1981), ____ Mont. ____, 631 P.2d 1273, 1278-1279, 38 St.Rep. 1040, 1047. In Wilson, we found this standard did not fall short of that articulated by the United States Supreme Court in Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573:

> ". . . the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

The State is not required to prove to this Court that all reasonable doubts were eliminated at trial, or that defendant's guilt has been proven to a moral certainty. Those determinations are for the jury. We must only consider whether the record presents substantial evidence, as defined above, to support the conviction. A review of the evidence presented to the jury firmly establishes that the jury's determination was supported by a sufficiency of the evidence.

Defendant claims that the District Court designated him a dangerous offender and sentenced him to life plus 120 years in Montana State Prison in violation of constitutional

provisions against cruel and unusual punishment. Defendant maintains that the sentence was unfairly imposed upon "a paralyzed amnesiac defendant who is virtually helpless," a man who cannot possibly be a danger to society, who requires physical therapy, special equipment and assistance in dressing and in toilet endeavors.

Ordinarily a sentence is not cruel and unusual punishment if it is within the maximum established by statute, Matter of Jones (1978), 176 Mont. 412, 420, 578 P.2d 1150, 1154; and review properly lies with the Sentence Review Division. State v. Metz (1979), ____ Mont. ____, 604 P.2d 102, 104, 36 St.Rep. 2261, 2264.

The fact that defendant is partially disabled does not automatically render him incapable of harming other persons or society. He is in possession of his faculties and is ambulatory, although confined to a wheelchair or walker. He stands convicted of a brutal crime against a defenseless old woman. This was not his first felony conviction; he was convicted of burglary on May 10, 1974. These facts are sufficient to justify the designation of dangerous offender under section 46-18-404, MCA. The determination was well within the discretion of the court. The judge stated reasons for his decision. We find no reason to change defendant's status as a dangerous offender.

Defendant also argues that he is incapable of meeting all of his physical needs and fears that the prison will fail to protect his safety and his health. The United States Supreme Court, in Estelle v. Gamble (1976), 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, held that a consideration of contemporary standards of decency reveals that prisoners' medical needs must be met. The Court stated:

> "We therefore conclude that deliberate in-
> difference to serious medical needs of
> prisoners constitutes the 'unnecessary and
> wanton infliction of pain,' Gregg v. Georgia
> [(1976), 428 U.S. 153, 96 S.Ct. 2909, 49
> L.Ed.2d 859], . . . proscribed by the Eighth
> Amendment. This is true whether the indif-
> ference is manifested by prison doctors in
> their response to the prisoner's needs or
> by prison guards in intentionally denying
> or delaying access to medical care or inten-
> tionally interfering with the treatment once
> prescribed. Regardless of how evidenced,
> deliberate indifference to a prisoner's
> serious illness or injury states a cause of
> action under [42 U.S.C.] § 1983." Estelle
> v. Gamble, 429 U.S. at 104-105, 97 S.Ct. at
> 291, 50 L.Ed.2d at 260.

However, as the State points out, defendant's protest is premature. The Montana State Prison is not without medical facilities and medical personnel. We have no reason to believe that defendant's serious medical needs will be disregarded. Defendant has made no showing that the Department of Institutions will confine him in the Montana State Prison; nor has he shown that, should he be so confined, the prison is incapable of meeting his medical needs. He has certainly not shown that the State has inflicted or will unnecessarily and wantonly inflict pain or deliberately disregard his serious medical needs. That he will not receive the solicitous care tendered him at home is unquestionably true; that his disability renders him more vulnerable to other inmates cannot be disputed. Nevertheless, these facts do not raise defendant's sentence to the level of an Eighth Amendment violation. We find no infliction of cruel and unusual punishment in this sentence. Should defendant, during his time in custody, feel that the State's care has become so deficient as to amount to an Eighth Amendment violation, his remedy is a §1983 action.

In summary, we note that, while there were a number of

errors committed by the District Court in the long and complicated investigation and trial of this case, they were not substantial enough, singly or as a whole, to jeopardize defendant's right to a fair trial.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

-36-