No. 83-44

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

STATE OF MONTANA,

　　　　　Plaintiff and Respondent,

　-vs-

WILLIAM LEE "RANDY" CLARK,

　　　　　Defendant and Appellant.

---

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Phillips,
The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

　　　For Appellant:

　　　　　　　Francis J. McCarvel, Glasgow, Montana
　　　　　　　David L. Irving argued, Glasgow, Montana

　　　For Respondent:

　　　　　　　Hon. Mike Greely, Attorney General, Helena, Montana
　　　　　　　Jim McLean argued, Asst. Atty. General, Helena
　　　　　　　Willis M. McKeon, County Attorney, Malta, Montana

---

Submitted:　November 29, 1983

Decided:　May 8, 1984

Filed: **MAY - 8 1984**

*Ethel M. Harrison*
_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant appeals from a jury verdict and judgment finding him guilty of eight counts of sexual intercourse without consent. We affirm the jury verdict and the judgment of the District Court.

The issues on appeal are:

(1)  Did the trial court err in allowing the defendant to be charged and tried on the amended information?

(2)  Did the trial court err in excluding opinion testimony of defendant's professional investigator?

(3)  Was the State's cross-examination of defendant's character witness, Larry Simpson, improper?

(4)  Did the State improperly impeach defendant's testimony by using irrelevant, prejudicial evidence during cross-examination?

(5)  Was the testimony of State rebuttal witness, Dr. William Stratford, properly allowed?

Defendant was reunited with his wife and three step-children in Saco, Montana on April 4, 1981, after serving thirteen months at the Lompoc Federal Penitentiary in California. Defendant's 9 year old son by a previous marriage also came to live with the family. Defendant's wife, Mary, worked full-time and defendant did odd jobs and ranch work.

During a family argument on the evening of July 6, 1981, defendant's 12 year old step-daughter, T., told Mary that the defendant had raped her. The argument intensified and the defendant battered both T. and her mother. Mary left with her three children and drove to New Orleans. After receiving psychological counseling in New Orlean's, T. and Mary returned to Montana to institute criminal charges against the defendant.

2

Defendant was arraigned on December 17, 1981 on an information charging him with eight counts of sexual intercourse without consent. The information specified the days on which the alleged rapes occurred. Defendant pled not guilty. On March 9, 1982, defendant filed notice of an alibi defense. On April 9, 1982, the State noticed its intent to amend the information. Defendant objected to the amended information, which alleged the time of the rapes less precisely than the original information. The trial judge permitted the amended information to be filed and defendant again pled not guilty on April 23, 1982. Trial by jury began July 27, 1982.

T. testified that she was a seventh grader in 1981. The defendant first approached her three days after he came home from prison. He came into her bedroom, put his arm around her, and tried to kiss her while her mother was in the shower. T. pulled the covers up around her and defendant left her bedroom. Five to eight days later, defendant called T. into his bedroom around 4:00 or 4:30 in the afternoon, while Mary was still at work. He bolted the door with a lock T. could not reach and had intercourse with her. T. testified that this happened again and continued to occur until July 6, 1981, when Mary and the children left for New Orleans. T. explained that she did not tell anyone because she was "scared of him beating us and . . . scared to hurt my mother." T. testified the rapes usually took place in her mother's bedroom, sometimes in her own bedroom and once in the attic. She testified that it happened twice or more a week, sometimes four times a week, and more than once a day on two occasions. According to T., defendant repeatedly warned her not to tell anyone.

T. testified that the defendant had intercourse with her "approximately 40" times. She explained that she had originally picked specific dates "to get it over with" and that she had told the County Attorney it happened 8 times because she "was ashamed of how many times it really happened." She said she later told the State prosecutor 40 times "because it was bugging me because I didn't have the truth out."

T.'s testimony was corroborated in part by her brother, who was 9 years old in 1981. Her brother testified that defendant would tell the three younger children to go to the park, but tell T. to stay home. When they came back and the doors were locked, the children usually returned to the park. Once T's brother got a boost from his step-brother to look in the windows to see if anyone was home. In his mother's bedroom, he "saw Randy and T . . . laying in on the bed." He admitted on cross-examination that he could not see through the gauze curtain well enough to tell whether they were dressed.

Both T. and her mother testified that on the evening of July 6, 1981, when Mary confronted defendant with T's statement that he had raped her, defendant turned to T. and asked, "Why did you tell her?" Both testified that Mary asked if T. had been a virgin, and the defendant replied, "Well, it's too late now." Both Mary and T. testified that defendant physically assaulted them before they left the family home that night. Mary's sister testified that Mary arrived in New Orleans with scratches, finger marks on her neck, a hand imprint on her face, bruises down her side and a huge lump on one leg. T. had marks around her face and her glasses had been twisted and broken.

Defendant testified that "there was no violence in our house that night. There was never any violence in that house." He denied battering his wife and step-daughter. He testified that they had argued, but no allegation of rape was ever made. According to defendant, the problem was that T. thought she was pregnant. He insisted that Mary later contrived the charges and coerced T. and her brother to testify against him. He denied ever having raped T.

The jury returned a guilty verdict on each of the eight counts of sexual intercourse without consent. Judgment was entered designating defendant a dangerous offender and sentencing him to 30 years imprisonment at the Montana State Prison on each count, with the eight 30-year terms to run concurrently. Defendant appeals.

I.

Did the trial court err in allowing the defendant to be charged and tried on the amended information?

Defendant asserts that (1) the amended information is not sufficient as a charge, and (2) allowing the information to be amended after defendant pled not guilty and noticed an alibi defense prejudiced his substantial rights.

Defendant initially objected to the amended information because it alleged the time of the rapes less precisely than the original information. The original and amended informations set forth the times as follows:

| COUNT | ORIGINAL INFORMATION (filed October 23, 1981) | AMENDED INFORMATION (filed April 23, 1982) |
|-------|-----------------------------------------------|--------------------------------------------|
| I | On or about May 19, 1981 | Week of April 12, 1981 |
| II | On or about May 23, 1981 | Week of April 19, 1981 |
| III | On or about May 26, 1981 | Week of April 19, 1981 (different occasion than that alleged in Count II) |
| IV | On or about May 27, 1981 | Week of April 26, 1981 |

5

| V | On or about May 29, 1981 | Week of May 3, 1981 |
|---|---|---|
| VI | On or about May 30, 1981 (early evening) | Sometime during weeks of May 10, 1981 through June 21, 1981 |
| VII | On or about May 30, 1981 (about midnight) | Sometime during weeks of May 10, 1981 through June 21, 1981 (different occasion than that alleged in Court VI) |
| VIII | On or about July 3, 1981 | Week of June 28, 1981 |

Defendant contends that his substantial rights were prejudiced when the trial court allowed the amended information to be filed after he had pled not guilty to the original information and noticed an alibi defense. He claims the amended information effectively precluded any alibi defense because periods of time were substituted for specific days. Defendant concedes that generally time is not a material element of the offense of sexual intercourse without consent. However, here the amended information covers almost all of the three months the family was together, as opposed to seven specific dates.

The State argues that because the victim was a 12 year old child who was unable to pinpoint dates, the times stated in the amended information were stated as definitely as humanly possible. The State argues that to demand that a child specify the hour and date of each instance of sexual abuse in the home is to demand the impossible. The State amended the information because the prosecutor discovered that T. had based her original dates on an incorrect belief that the defendant had returned home in May, instead of April, 1981. The amendments do not change the nature of the offenses charged, only the times of the offenses.

Section 46-11-401(1)(iv), MCA requires that an information state "the time and place of the offense as definitely as can be done." The law does not, however,

6

demand impossible precision. In the homicide case of State v. Riley (Mont. 1982), 649 P.2d 1273, 39 St.Rep. 1491, this Court upheld the sufficiency of an information charging various acts of child abuse over a period of two years.

> "The law does not require that the time and place be stated with impossible precision; it merely requires that they be stated as definitely as possible under the circumstances of the case, unless time is a 'material ingredient in the offense.' See State v. Heaston, 109 Mont. at 307, 97 P.2d at 332. Here the information alleges a continuing course of abusive conduct towards James Gill, beginning when his family joined the River of Life Tabernacle group and culminating with the boy's death on January 9, 1981. When such a continuing course of conduct is alleged, further specificity is not required." Riley, 649 P.2d at 1277, 39 St.Rep. at 1496.

In judging whether the amended information here states the time of the alleged offenses with sufficient particularity, the court must determine (1) whether time is a "material ingredient in the offense," and (2) whether a continuing course of conduct is alleged.

Both the original and the amended information set forth facts alleging a series of incidents of unlawful sexual contacts perpetrated by the step-father upon the child. Incestuous conduct is charged as a series of offenses of sexual intercourse without consent with the same minor victim.

Incest generally involves a continuing course of sexual conduct between two family members within the family home. Incestuous conduct usually consists of a series of unlawful sexual contacts between an adult family member and a child. In these respects, sexual offenses committed against a minor by a parent or step-parent are distinguishable from rape cases involving adult victims and a single criminal event in unfamiliar surroundings. In addition, children are less likely to distinguish dates and times with specificity.

7

These distinctions are relevant to our consideration of the sufficiency of the amended information.

Defendant concedes that time is not a "material ingredient" in the offense of sexual intercourse without consent with a minor. Since time is not a material ingredient in statutory rape, "the information need only be specific enough to enable the defendant to prepare his defense and to protect him from being subsequently prosecuted for the same offense." State v. Roberts (Idaho 1980), 610 P.2d 558, 559. Defendant argues, however, that time became material once he noticed his alibi defense.

The argument that noticing an alibi defense confers materiality and makes time a necessary element of the State's case was addressed in State v. Hall (1976), 171 Mont. 33, 554 P.2d 755. Defendant Hall, was charged by information with first degree burglary and grand larceny "on or about the 19th day of August, 1973." He pled not guilty and filed a notice of intent to rely on an alibi defense. At trial, the State offered evidence that the burglary and larceny could have occurred anytime between August 17 and August 20, 1973. Defendant's alibi witnesses testified as to the period from August 18 through 20, but no alibi testimony was presented regarding August 17. The jury returned a guilty verdict.

On appeal Hall argued, as defendant does here, that notice of intent to rely on an alibi defense gives the State notice that time may become an essential fact of proof required to convict the accused. This Court concluded:

> "Assertion of the alibi defense does not change the nature of the crime charged here. Defendant should have realized the State would present evidence proving the crime took place sometime in the period between shutdown of the camp and discovery of the breakin. Defendant cannot restrict the state's case by merely asserting intent to rely on an alibi defense for a limited period of time within which

8

the crime could have occurred." Hall, 171 Mont. at 36, 554 P.2d at 757.

The defendant here had notice of the nature of the charges against him and adequate opportunity to defend. He did not request postponement of the trial date after the district court granted leave to file the amended information. Defendant presented two alibi witnesses and a witness who had investigated the charges contained in the original information.

Noticing an alibi defense to the original information did not change the nature of the charges against defendant or incorporate time as a necessary element of the State's proof. We conclude, as the Idaho Supreme Court did in State v. Rogers (Idaho 1929), 283 P. 44, 45:

> "It would be a very weak rule of law that would permit a man to ravish a fifteen year old girl . . . and then say in effect: 'You cannot convict me of this crime, as you did not guess the right date.'"

We hold that the amended information stated the time and place of the charged offenses as definitely as could be done under the circumstances of this case. Having concluded that defendant's assertion of an alibi defense did not change the nature of the offenses charged against him, we hold that the trial court did not err in allowing the defendant to be charged and tried on the amended information.

## II

Did the trial court err in excluding testimony of Don Goddard, defendant's professional investigator?

Defense counsel hired Don Goddard to investigate the charges alleged in the original information. Goddard testified that he talked to at least 35 or 40 people, reported to defense counsel, and was advised that an alibi

9

defense would be made based on his investigation of the original dates and times.

Goddard testified that he had worked as an insurance adjuster for 17 years after retiring from the Air Force, but that he also did legal investigations. He also testified that he attended "a course conducted by the Inspector General of the United States Air Force, for nine weeks, or approximately nine weeks, where the emphasis was on investigative procedures and reports writing," and that he did 2 or 3 investigations for criminal defense lawyers each year.

The trial court sustained the State's objection when defense counsel asked Goddard whether his investigation established that defendant was not home at those times specified in the original information. The State asserted that the question lacked relevancy since defendant was being tried on the amended information. Defense counsel argued that Goddard's testimony regarding alibi evidence was relevant to impeach T.'s testimony. The trial court refused to allow Goddard to synopsize evidence gleaned from the approximately 40 persons whom Goddard had interviewed during his investigation. In ruling that Goddard could not testify that other witnesses had furnished defendant with a perfect alibi to the original information, the trial court noted that defense counsel could still argue to the jury that T. changed her story and the original information was amended after the original charges were investigated.

The assertion that Goddard was called as an expert witness is made for the first time on appeal. Since no such assertion was made during the trial, the adequacy of Goddard's qualifications to testify as an expert was not challenged. Even if he were qualified by knowledge, skill,

experience, training or education to testify as an expert witness, the subject matter of his proposed testimony does not require expert testimony. Rule 702, M.R.Evid., permits opinion testimony by an expert where "scientific, technical, or other specialized knowledge" is involved. Goddard's proposed testimony about defendant's alibi defense and the victim's credibility did not involve scientific, technical or specialized knowledge. Goddard's proposed testimony about the results of his investigation was not a proper subject matter for expert testimony.

Rule 701, M.R.Evid., permits lay witnesses to testify about their opinions as long as those opinions are based on their own perceptions. Goddard's proposed testimony was not based on his own perceptions. He proposed to summarize alibi evidence gathered from interviewing other persons regarding the crimes charged in the original information. Alibi evidence is properly presented by witnesses testifying as to their own opinions and perceptions. The jury is just as qualified as an investigator to draw inferences and conclusions from evidence of alibi.

In addition to Goddard, the defense presented two actual alibi witnesses to the jury. Irving Simpson testified that defendant often worked at his ranch during the evenings and spent five days on the range with him in the later part of May. Walter Pekovich testified that he often jogged and lifted weights with defendant in the evenings. We note that the testimony of these alibi witnesses falls far short of investigator Goddard's proposed summary of witness statements.

We hold that the trial court properly excluded hearsay and opinion testimony of defendant's investigator, Don Goddard.

11

Was the State's cross-examination of defendant's character witness Simpson improper?

Irving Simpson testified as a character witness for the defendant. Simpson had known defendant for three years and had used him as a hired hand on his ranch in 1979 and 1981. On direct examination, Simpson testified at length as to the defendant. His testimony was strongly supportive of the defendant. In substance, he testified that the defendant was a top ranch hand; that he was good with animals; that Simpson had never seen the defendant "abuse nothin"; that once Simpson saw a horse rear and hit the defendant hard in the nose, but the defendant "didn't get violent or nothin like most guys would"; that the defendant liked to have his family, including the children, with him while he worked; that he liked his kids very much and he never raised his voice to them; that he was a faithful worker who continued to work regardless of the time of the day and would return in the evening when necessary; that when Simpson was involved in a protest on adjoining federal land, the defendant, who was on parole at the time, insisted on riding side-by-side with Simpson; that he suffered personal injury and discomfort without complaint; that he was frequently a guest at the Simpson house and was "real polite"; that they were very good friends and had no arguments or fights. On cross-examination, Simpson indicated that he would trust the defendant with anything of his and that he never did catch the defendant lying to him. On redirect examination, Simpson testified that as far as he knew, the defendant had never lied to him. With regard to defendant's peaceful or violent nature, Simpson testified on redirect examination:

"Q. Would you describe Randy as a violent man?

"A. No. I never have seen him raise his voice, scream at the kids or cattle or anything.

"Q. Physically abuse anyone?

"A. No."

By this evidence defense counsel placed in issue the character of the defendant with regard to truthfulness and non-violence or peacefulness.

With regard to the opinions expressed by witness Simpson on redirect examination, he was examined by the State on recross-examination as follows:

"Q. If there were any instances of violence, would that change your opinion at all?

"A. Oh, you bet, yah.

"Q. What if they occurred prior to the time that you knew him?

"A. It would change my opinion.

"Q. It would change your opinion?

"A. Yah.

"Q. If you knew that he had done - committed some violent crime?

"A. Yah.

"Q. Would it change your opinion of him as a friend and as a person, if you knew that he had lied to you?

"A. Yup.

"Q. Would it bother you if you found out that he had lied to you about being a prisoner of war? Would that change your opinion of him?

"A. I imagine it would, yes, mmhm."

In chambers, counsel for the State and defense counsel then discussed the nature of the examination planned by the State. The State pointed out that under Rule 405(b), M.R.Evid., when a defense witness presents favorable opinion evidence to the jury, the State is entitled to challenge the witness' basis for knowledge. The State contended it was entitled to test Simpson's opinion by inquiring whether he

13

knew that the defendant had been convicted of armed robbery and that he forcibly escaped from jail by overpowering a jailer. While defense counsel suggested that perhaps testimony should be limited to the same period of time about which witness Simpson had testified on direct and redirect examination, no objection was made to this type of evidence.

In substance the State then inquired of witness Simpson whether his opinion of the defendant, as non-violent, trustworthy and believable, would change if he knew (1) that in October, 1975 the defendant was convicted of first degree robbery in the state of Kentucky; (2) that he attempted to hijack an airplane while in Vietnam, assaulted the pilot with a .45 caliber pistol and threatened to kill him; (3) that a month after the incident with the airplane, he burned down a prison cell block and escaped in Vietnam; and (4) while in custody in Great Falls, he overpowered a jailer, sprayed him with a fire extinguisher and escaped from jail. Simpson indicated that his opinion might change in connection with some of these points.

The State then asked if he knew that the defendant was never a prisoner of war. At this point, defense counsel objected that no record of these facts existed. Counsel for the State stated, "Ethically I'm bound to have prima facie showing that this is in fact true, and I state as an officer of this court that I can establish that." The court allowed the State to proceed. Defense counsel made no further objection.

Witness Simpson further testified:

"Q. So if those things were true, Mr. Simpson, you would have an entirely different view of the Defendant, would you not?

"A. Yes, if I knew that they was true - if I knew it when I hired him, I wouldn't have hired him.

14

"Q. I know that. But if you found that they were true now, your opinion would change drastically wouldn't it?

"A. Yah, it would.

"Q. And you would feel like you had been taken to the cleaners, wouldn't you?

"A. Yes."

Defendant contends that inquiring into these specific instances of conduct was improper cross-examination. He argues that the alleged conduct was unrelated to the crime charged and irrelevant. He also argues that if the conduct is deemed to be relevant, then its prejudicial effect outweighs any probative value.

The State contends that the defense opened the door by placing defendant's character traits of honesty and peacefulness in issue. The State further contends the cross-examination properly tested the credibility and reliability of Simpson's direct testimony that the defendant never lied and was not a violent man, and that all its challenged questions were within the scope of direct examination.

Admissibility of evidence on relevancy grounds is governed by Rules 401 through 411, M.R.Evid. Character evidence is generally not admissible. Rule 404, M.R.Evid. However, where the accused offers evidence of a pertinent trait of his character, then evidence is admissible by the prosecution to rebut the same. Rule 404(a)(1), M.R.Evid. The prosecutor is permitted to cross-examine the witness to test the witness' grounds of knowledge.

The method of proving the evidence of a pertinent trait of the defendant's character is provided in Rule 405, M.R.Evid., which covers proof by testimony as to reputation or testimony in the form of an opinion:

"(a) _Reputation or opinion._ In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or _by testimony in the form of an opinion._ On _cross-examination, inquiry is allowable into relevant, specific instances of conduct._" (emphasis added)

Although the majority of jurisdictions have made reputation the exculsive mode of proof, Montana follows the modern trend to accept both reputation and opinion. 7 Wigmore, _Evidence_ §1983 (Chadbourn Rev. 1978) at 215.

Simpson testified at length and in detail as to the defendant's character with particular emphasis on his truthfulness and peacefulness. Defendant denied having sexual relations at any time with T. and denied any act of violence towards T. As a result, questions regarding defendant's character traits of truthfulness and peacefulness pertain to the key parts of his defense. It was appropriate that the State inquire on cross-examination.

The leading case on the scope of cross-examination of a character witness is Michelson v. United States (1948), 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168. While the testimony involved in _Michelson_ was testimony regarding the reputation of the defendant, the principles enunciated by the Court are applicable. The United States Supreme Court discussed several critical factors, including (1) that the trial court took pains to ascertain that the prior crime was an actual event; (2) the trial court instructed the jury to consider the inquiry only for the limited purpose of evaluating a witness's testimony; (3) there was no specific objection made by the defense attorney. The other factors discussed by the Court are not pertinent.

Our Rule 405, M.R.Evid. is a development that extends beyond the type of evidence allowed in _Michelson_ in 1948, when evidence of character was presented by evidence of reputation only. Rule 405, a more modern rule, allows

16

character evidence to be presented through testimony in the form of an opinion as well as testimony as to reputation. Rule 405(a), M.R.Evid. specifically allows the inquiry on cross-examination into relevant, specific instances of conduct.

Here, the prosecutor's questions all dealt with specific instances of conduct which had a direct relationship to the character traits of truthfulness and non-violence or peacefulness. The cross-examination was specifically allowable under the rules. The only objection made by defense counsel was to the absence of a record showing the defendant was never a prisoner of war. In response, the prosecution stated as an officer of the court that this could be established as true. No further objection was made by counsel for the defendant. No specific objection was made by the defense attorney to the whole line of questioning. The trial court carefully instructed the jury to consider the inquiry only for the limited purpose of evaluating the opinion. The Michelson factors were properly considered.

We hold that the questioning on cross-examination of character witness Simpson was within the scope of the direct examination, consisted of inquiry into relevant, specific instances of conduct as authorized under Rule 405, and was proper to impeach the witness' opinion testimony.

IV

Did the State improperly impeach defendant's testimony?

Defendant contends that he was improperly cross-examined on many separate, collateral crimes or wrongs that were irrelevant. In the alternative, he contends that even if this evidence were relevant, the combined prejudicial effect upon the jury outweighed any probative value.

The State contends that the prosecutor properly impeached defendant's character evidence and his defense

17

theory that Mary Clark fabricated evidence in order to frame him. The State further contends that evidence regarding defendant's military history was admitted to rebut defendant's direct testimony.

Rule 403, M.R.Evid. provides for exclusion of otherwise relevant evidence:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

A key element of this rule is the trial judge's discretion to decide whether otherwise relevant evidence is to be excluded because of the factors listed in the rule. See Commission Comments, Rule 403, M.R.Evid. The court has a duty to conduct the trial in a fair manner and has a great amount of discretion in so doing. State v. Dickens (Mont. 1982), 647 P.2d 338, 341, 39 St.Rep. 1137, 1140; State v. LaMere (Mont. 1980), 621 P.2d 462, 466, 37 St.Rep. 1936, 1941.

On direct examination, the defendant testified to the following collateral crimes or wrongs: While in Vietnam in 1968, he boarded a plane with an automatic pistol and without a pass, walked to the cockpit, locked the door and talked to the pilots for three hours, trying to convince them to take him to Hong Kong. He escaped from the brig and lived in the Chinese section of Saigon for 116 days. During that time he was held as a prisoner by the North Vietnamese for 2 days. He was never officially classified as a prisoner of war because he was on desertion status at the time. Defendant escaped from a maximum security federal mental institution upon his return to the United States in 1969 and was in five psychiatric hospitals before receiving an honorable discharge and medical retirement from the military. He pled guilty to robbery of a motor vehicle and escape in 1975 and guilty to

18

transporting a stolen car across state lines and jumping bond in 1979.

Defendant also testified on direct examination to the following acts of misrepresentation: He told people in Saco that he received income from his father's business because he did not want to say he received a $1,733 per month disability pension from the Veterans Administration. He told Roy Sauder that he was "a qualified group therapist," so he could work at a youth camp helping delinquent juveniles. He told Ed Kelsey that he had studied veterinary medicine so Roy would agree to destroy a horse at the youth camp. He told a U.S. Department of Interior secretary that he was an attorney trying to talk with Secretary Watt. Defendant characterized these misrepresentations as doing favors for friends and concluded, "I did nothing malicious by misrepresenting myself to anybody."

Regarding his home life, defendant testified on direct examination that "there was never any violence in that house." He denied hitting Mary. He contradicted T's testimony that he hit her in the face with the telephone. He testified he "never laid a hand on those kids." He denied the charges against him, testifying that he never in his life had sexual intercourse with or abused T.

On cross-examination, defendant denied that he had actually threatened anyone in the 1968 airplane incident in Vietnam, but he admitted that he had pled guilty to hijacking, assaulting the pilot and crew, and carrying a concealed weapon. He admitted to escaping from the brig and pleading guilty to desertion, then altering his own military records to reflect that he had been a prisoner of war. He also admitted to pleading guilty later to escape, mutiny and arson while in the service.

In contradiction to defendant's assertion that he only lied to do favors for friends, he admitted on cross-examination that he had falsified a birth certificate to obtain a driver's license. In contradiction to his characterization of himself as a nonviolent, nonabusive individual, defendant admitted that he had written letters to Mary after his arrest threatening to kill her.

It is a well-settled rule that the proper scope of cross-examination is determined by the scope of direct testimony. Here, the defendant offered direct testimony about specific instances of past conduct. As part of his defense, he reiterated these instances and attempted to explain any conduct from which the jury might conclude that he was not a peaceful, honest man, who had been repeatedly wronged by circumstances beyond his control.

Defendant specifically challenges the prosecutor's use during cross-examination of letters he admitted writing to his wife. These letters were of a threatening nature. They were not offered or admitted into evidence, and no objection to their use was made by defense counsel at trial. Defendant asserts that, even absent objection, cross-examination regarding the letters was reversible error in that it confused and prejudiced the jury in violation of Rule 403, M.R.Evid. We disagree.

Cross-examination tending to prove that the defendant had attempted to intimidate Mary Clark went to the heart of the defense theory that Mary had coerced her children and perjured herself in order to frame the defendant. In State v. Shaw (Mont. 1982), 648 P.2d 287, 39 St.Rep. 1324, this Court stated that "[i]n a criminal prosecution any attempted intimidation of a witness is properly attributable to a consciousness of guilt and testimony relating thereto is

20

relevant and admissible in evidence." 648 P.2d at 289-90, 39 St.Rep. at 1327, quoting People v. Smith (1972), 3 Ill.App.3d 958, 279 N.E.2d 512, 513. We conclude that this rule applies to documentary evidence as well as to testimony. We find no abuse of discretion in the trial court and hold that it was not error to permit cross-examination on this element of the defense theory.

Secondly, defendant challenges admission of State's Exhibit 21, a detailed psychological report supposedly from Bethesda Naval Hospital. Defense counsel objected to admission of the report into evidence on the grounds of relevancy, after defendant had identified the document and admitted that he had fabricated it. The court admitted the report as evidence of defendant's ability to manufacture evidence and to fabricate. We find no error in the admission of a psychological report that indicates the degree of skill with which defendant could fabricate when it suited his purpose.

In significant part, the jury was required to resolve a basic contradiction between the testimony of the defendant and that of the victim. The traits of honesty and peacefulness were the bulwark of the defense. The State's cross-examination of the defendant was no broader than was required to meet the bold assertions and admissions during the direct examination of the defendant.

We hold that the questioning by the State was proper impeachment of the defendant.

V

Was the testimony of the State's rebuttal witness, Dr. William Stratford, properly admitted?

Dr. Stratford, a medical doctor and psychiatrist, was called as a rebuttal witness by the State. He was offered as

an expert witness in forensic and child psychiatry. As foundation for his expert testimony, Dr. Stratford testified that he was a psychiatrist for Montana State Prison for six years; that forensic psychiatry constituted approximately one-third to one-half of his practice, and that he had testified as an expert in forensic psychiatry in hundreds of criminal cases. Dr. Stratford also testified that child psychiatry was his subspecialty, that he had rendered in excess of 2,500 court evaluations concerning criminal and civil matters, including child custody, and that he had been accepted as an expert in child and adult psychiatry in hundreds of court cases. The court accepted Dr. Stratford as an expert witness in all fields of psychiatry, including adult and child psychiatry.

The trial court had originally ordered Dr. Stratford to determine whether the defendant was competent to stand trial. Dr. Stratford had visited the defendant four times in the county jail prior to trial. He testified that it was his expert opinion and diagnosis that the defendant was malingering, making a conscious attempt to appear mentally ill, and that defendant suffered from antisocial personality disorder.

As an expert in child psychiatry, he testified that it is not unusual for a child initially to deny the number of times she has been sexually assaulted. Regarding this avoidance or denial tactic, the State posed the following hypothetical question:

"You can assume the following facts: You can assume that a girl 12 years old gives a statement in which she relates that her step father raped her, sexually assaulted her, over a period of about 13 weeks, and on the initial occasions that she talked to Law Enforcement, she states that it occurred on about eight occasions. As time goes on, she reveals that it occurred on about forty occasions, or as many as 40, not less than 25, not

22

more than 40. She states that on occasion when questioned by her peers that she gave the answer her mother told her to say this, it really didn't happen. Now, what can you tell me as far as that child is concerned - whether or not those kinds of responses are tactics of avoiding - to avoid talking about the incident?"

Dr. Stratford explained that sexually abused children are usually female and are often dealing with fear because they have been overtly threatened. Denial occurs because "oftentimes children feel filthy, dirty, ashamed, they feel often guilty, responsible - they're basically afraid of upsetting the family constellation and they're afraid of what their parents - mother or step father - may do to them."

Defendant contends that Dr. Stratford's testimony was improper rebuttal evidence and that his conclusion and diagnosis were based on privileged communications.

The State contends that only defendant's statements are protected communications and that Dr. Stratford properly testified as to defendant's condition. His testimony was relevant and admissible because it tended to refute testimony that the defendant was nonthreatening and to explain testimony that T. denied the rape at school.

"Rebuttal testimony is that which tends to disprove or contradict evidence presented by the adverse party." State v. Williams (1979), 185 Mont. 140, 153, 604 P.2d 1224, 1231. The facts of this case do not support defendant's contention that Dr. Stratford presented new evidence rather than rebuttal testimony. Dr. Stratford's diagnosis coincided with that of defense witness, Dr. Moss, who diagnosed the defendant as a sociopath. However, Dr. Stratford's conclusion that the defendant was malingering and consciously attempting to appear mentally ill refuted defendant's express denial that he was "putting on an act . . . [to] gain favor in court."

23

Another defense witness testified that when T. was asked at school whether Randy really raped her, she said "No, my mom is just making me say that." Dr. Stratford's explanation of children's denial or avoidance tactic directly contradicts the direct testimony of this defense witness. It indicates that T.'s denial reaction was typical of children who are sexual assault victims.

Defendant asserts that Dr. Stratford's diagnosis was based on confidential communication with him and was therefore inadmissible. We disagree.

Section 46-14-401, MCA provides in pertinent part:

"_Admissibility_ _of_ _statements_ _made_ _during_ _examination_ _or_ _treatment_. A statement made for the purposes of psychiatric examination . . . is not admissible in evidence against him in any criminal proceeding, . . . on any issue other than that of his mental condition. It is admissible on the issue of his mental condition, whether or not it would otherwise be considered a privileged communication, unless it constitutes an admission of guilt of the crime charged . . ."

Defendant contends that this statute precludes Dr. Stratford's testimony regarding his mental condition because (1) Dr. Stratford's knowledge of defendant's condition was acquired during the court-ordered examination, and (2) Dr. Stratford's diagnosis was based on privileged communications.

Section 46-14-401, MCA is based on Model Penal Code, section 4.09.

"This section embodies the view that the important expert knowledge of the mental condition of a defendant acquired by examination or treatment on order of the court should be fully available in evidence in any proceeding where his mental condition may properly be in issue; but . . . the defendant's statements made for this purpose may not be put in evidence on any other issue." Commission Comments, section 46-14-401, MCA.

It does not restrict the manner in which the issue of defendant's mental condition may arise. In fact, the Official Comments to the Model Penal Code state that section

4.09 "clearly makes statements made for purposes of either examination or treatment admissible on the issue of mental condition wherever and however that issue may arise."

While it is true that the defendant did not notice a defense of mental disease or defect, he placed his mental condition in issue by calling Dr. Scott Moss, a clinical psychologist, as a defense witness. Counsel for the defendant asked Dr. Moss to relate to the jury the kinds of treatment programs defendant had participated in at the Federal Prison in Lompoc, California. Defense counsel also asked Dr. Moss how reliable he believed the Veterans Administration Hospital's diagnosis of paranoia schizophrenia was and whether that diagnosis affected the therapy he had given the defendant. Dr. Moss' direct testimony as an expert witness for the defense clearly placed the defendant's mental condition in issue.

Section 46-14-401, MCA protects statements made as privileged communications, such as an accused's confession to a psychiatrist. No such statements were involved in Dr. Stratford's testimony about the defendant's mental condition. That section does not preclude psychological testimony by a court-appointed psychiatrist, where the issue of defendant's mental condition is raised by the defense during trial.

Where a defendant places his mental condition in issue, the State must be afforded the opportunity to present rebuttal evidence. A court-appointed psychiatrist may testify as a rebuttal witness if his diagnosis of a defendant's condition differs from that of an expert witness for the defense. Such a rule makes use of information gathered by a neutral factfinder. See In re Miller (1977), 175 Mont. 318, 573 P.2d 1155; In re Sonsteng (1977), 175 Mont. 307, 573 P.2d 1149. It does not negate the statutory

prohibition against revealing statements made during a court-ordered examination.

We hold that the testimony of the State's expert, rebuttal witness was properly admitted.

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

26

I respectfully dissent.

The trial court erred in permitting defendant's Vietnam service record to be introduced for the purpose of rebutting the testimony of the witness Irvin Simpson.

The majority opinion recites at length the testimony of this witness that the defendant was a top ranch hand; that he was good with animals; that the defendant liked to have his family and children with him while he worked; that defendant was a faithful worker; that the defendant suffered personal injury and discomfort without complaint. The witness also testified that the defendant had never lied to him, that he had not seen him physically abuse anyone and that defendant had not raised his voice or screamed at the kids or cattle. Of course, all of this testimony was objectionable. The testimony did not prove character.

The rule is well settled that witnesses called by defendant may not testify about defendant's specific acts or courses of conduct. Michelson v. United States (1948), 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed 168. A character witness's knowledge of particular acts is not admissible to prove the character of the accused since the word "character" means reputation as distinguished from disposition. Stewart v. U.S. (1939), 104 F.2d 234, 70 App.D.C. 101. Evidence that the defendant was charitable is held not to be admissible to prove good character. Steinberg vs. U.S., 162 F.2d 120, certiorari denied 68 S.Ct. 108, 332 U.S. 808, 92 L.Ed. 386. Testimony as to defendant's conduct as an employee likewise has been held inadmissible as character evidence. U.S. v. White (1963), 225 F.Supp. 514, cause remanded 349 F.2d 965.

Here the prosecution sought to impeach the testimony of witness Simpson with specific acts of conduct committed while the defendant was in service in Vietnam. The admissibility

27

Hon. Frank B. Morrison
Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana 59620

Date:

Re: July 10, 1984

State v. Clark, No. 83-44, May 8, 1984, dissent

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

Page 28, line 19 --- State v. Mormon should read State v. Moorman. (Also cited in line 20, same page).

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165

of this type of evidence is governed by Rule 405(a) M.R.Evid., which states:

> "(a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

The witness Simpson could have properly expressed an opinion with respect to defendant's reputation for either honesty or peacefulness. On cross-examination the State then could have inquired about specific acts which were relevant to the reputation testimony.

Rule 405(a) is not clear whether the witness can give testimony beyond the scope of his own knowledge. Historically the rule has been that character witnesses could give testimony respecting the defendant's reputation in the community. State v. Mormon (1958), 133 Mont. 148, 153, 321 P.2d 236. In Mormon this Court did allow cross-examination on specific acts but indicated that those acts must have been committed in the community where the witness formed his opinion about the defendant's reputation. The Court said:

> "While the general rule may be as defendant states, that is, cross-examination of character witnesses must be based on acts within defendants community. In this regard see citation of authority in Annotation, 71 A.L.R. 1504, 1517, 1535. It was not contended by defendant or the State that the acts upon which the character witnesses were cross-examined occurred anywhere but in Laurel, the community where defendant had lived most of his life, the community in which the character witnesses knew him, the community in which they had heard the rumors and reports propounded to them. From the foregoing discussion it is apparent to this Court that defendant's second alleged errors without merit."

In this case we are presented with testimony of a witness who testified about defendant's work habits and the way he treated animals and children. No character evidence was given. If the witness had expressed an opinion about the

28

defendant's reputation in the community cross-examination would properly be permitted on specific acts of the defendant which occurred in the community and which would tend to impeach the direct testimony. The rule would not allow for testimony about the defendant's conduct in Vietnam. However, in this case no character evidence was even offered and no specific acts refuting character testimony should have been allowed.

The State failed to object to the inadmissible testimony offered by the defendant's witness Simpson. Since the testimony was in the record it could be refuted by the State but the impeachment evidence would have to be limited to that evidence directly contradicting the witness. In other words, evidence could have been introduced to show that defendant did mistreat children or animals in the presence of the witness.

Perhaps this seems technical but the rules of evidence have a sound basis. Specific acts of misconduct on the part of the defendant have a tendency to prejudice the defendant's right to a fair trial and must be carefully controlled by the trial court. The testimony here admitted against the defendant far exceeded the bounds of any legitimate impeachment inquiry.

I would reverse and remand for a new trial.

Justice

29

Mr. Justice Daniel J. Shea, dissenting:

Generally, I agree with Justice Morrison in his conclusion that the offered evidence was not properly character evidence, and therefore, even if defendant opened the door, the offered evidence was inadmissible.

Beyond this, however, I believe that even if the evidence were admissible under the theory taken by the majority, the evidence was so highly prejudicial, so highly inflammable, that the trial court should not have admitted it in any event. It is but another example of the State seeking to achieve a conviction by any means possible, and in doing so stretching the law of evidence beyond the breaking point.

_____
                Justice

Mr. Justice John C. Sheehy:

I concur in the foregoing dissents of Mr. Justice Morrison and Mr. Justice Shea.

_____
          Justice

- 30 -