No. 85-550

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

STATE OF MONTANA,

         Plaintiff and Respondent,

-vs-

DALE STATCZAR,

         Defendant and Appellant.

_____

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William Boggs argued, Missoula, Montana
Ferguson & Mitchell; Paulette C. Ferguson, Missoula,
Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Kimberly Kradolfer argued, Asst. Atty. General, Helena
Robert Deschamps, III, County Attorney, Missoula,
Montana; Karen Towsend argued, Deputy County Atty.

_____

Submitted: June 10, 1987

Decided: October 6, 1987

Filed: OCT 6 - 1987.

*Ethel M. Harrison*

Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Defendant Dale Statczar appeals his conviction for sexual intercourse without consent. Defendant was charged by information on November 18, 1983. In January 1984, defendant was found unfit to proceed to trial in a competency hearing held pursuant to § 46-14-221, MCA. Following a second competency hearing in September 1984, the court reversed its earlier decision and found defendant Statczar fit to proceed to trial. Defendant's first trial in April, 1985 resulted in a hung jury. Defendant was convicted following his second trial in May and June, 1985. He was sentenced to twenty years in the Montana State Prison with fifteen years suspended.

We reverse.

Ten issues are presented for our review. Because we are reversing defendant's conviction, we limit our review to the following issues:

(1) Did the District Court err when it permitted the defendant's former attorney, John Riddiough, to testify at trial?

(2) Did the District Court violate defendant's right against self-incrimination when it permitted the State to call Dr. William Stratford to testify against defendant?

(3) Does substantial evidence support the District Court's determination that defendant was fit to proceed to trial?

(4) Did the District Court err when it denied defendant's motion for a mistrial based on alleged improper prosecutorial comments during closing argument?

The victim, J. R., testified as follows. In the early morning hours of October 16, 1983, she was attacked by two men outside a Circle K store located on Russell and Longstaff

2

Streets in Missoula. Moments prior to the attack, J. R. made a phone call to her boyfriend, Lane Cunningham. J. R. and Cunningham argued during the telephone conversation. Cunningham eventually hung up on J. R.. While J. R. was redialing Cunningham's phone number, the defendant approached her and asked if he could borrow some cigarettes. J. R. refused. After Cunningham hung up on J. R. a second time, she walked to her car for money for additional phone calls and more cigarettes. J. R.'s car was parked beside the Circle K store. As J. R. approached her car, two men grabbed her from behind and dragged her to another vehicle. She recognized one of her assailants as the man who had earlier asked for cigarettes.

After J. R. was dragged to the other vehicle, one of her assailants held her down, while the defendant moved on top of her. J. R. stated she was raped with an artificial device, "a penis that wasn't real." She also testified that the artificial penis was shoved into her mouth and she described biting it and causing no reaction in the defendant. J. R. was able to determine that defendant was wearing "some sort of bag" along his thigh. Finally, J. R. testified the defendant inserted several smooth stones in her vagina after defendant's accomplice asked if "he'd gotten his rocks off yet." J. R. was further assaulted and threatened by the two men before being pushed from the car. Testimony at trial established the above-mentioned attack took place between 2:30-3:00 a.m., with the most likely time of attack at 2:45 a.m.

At 3:14 a.m., 911 received a call from a woman who requested to remain anonymous, stating that she witnessed, approximately one-half hour previously, a rape or its aftermath at the Circle K store on Grant Avenue and South Avenue. The anonymous caller stated the victim had left the crime

3

scene in a car. The caller further stated that she followed the victim to 14th Street, where the victim parked her car and disappeared on foot. The informant stated she stopped, looked in the car, and found a purse containing a slip of paper with two telephone numbers. She recited the numbers to the 911 operator. The telephone numbers belonged to Lane Cunningham and Delores Reno. In response to the call, a patrol car was dispatched to the Circle K at Grant Avenue and South Avenue. The officers found no evidence of a disturbance.

At 4:35 a.m., J. R. placed a call to 911. She reported that she was attacked after making a phone call at the Circle K store on Grant Avenue and South Avenue. Missoula City Police Officer Don Millhouse responded to J. R.'s call at 4:54 a.m. J. R. reported to Millhouse that she had "recovered" her car and purse. J. R. then changed her statement and told Officer Millhouse she was attacked near another Circle K store at Russell and Longstaff.

J. R. was taken to St. Patrick's Hospital. She was examined by emergency room personnel. J. R. had scratches around the chest, abdomen, and breasts and dirt around the perineal area, and "five roundish stones in the vagina, ranging in size from a quarter of one inch to two inches."

Later that afternoon J. R. told Detective Pete Lawrenson that her assailant was a white male, twenty-five to thirty years of age, 5'6" to 5'8" in height, with bushy sideburns and a mustache. She also stated that he had a plastic-like bag attached to his leg. She described the assailant's vehicle as a dark colored "car-like truck." The assailant was wearing a dark jacket with something silver, perhaps buttons, on the shoulder.

Detective Lawrenson contacted each Missoula urologist for information concerning a person matching this

4

description.   Dr. Bryan Olson responded that defendant Dale Statczar matched the above-mentioned description.

Detective Lawrenson presented J. R. with a six-person photo lineup including Statczar's photograph.   J. R. identified defendant Statczar as her assailant.

Defendant was arrested eighteen days after the crime, on November 3, 1983. A dark blue Chevrolet "El Camino" belonging to defendant Statczar's brother was found outside defendant's home. Law enforcement personnel did not conduct a forensic test of the vehicle's interior.   A search warrant for defendant's residence led to the seizure of a dark jacket with silver buttons and a plastic syringe which the defendant used for maintenance of his urine bag.

Defendant Statczar, at the time of his arrest, was twenty-three years old.   When Statczar was nineteen years old, he was involved in a motorcycle accident leaving him impotent, without urinary function and with a stiff and disfigured left leg.   Statczar spent approximately one and one-half years at St. Patrick's Hospital in Missoula recovering from his injuries.   Testimony revealed that prior to his motorcycle accident Statczar possessed severe learning disabilities.

Statczar was sent on November 3, 1983, to the Montana State Hospital at Warm Springs for evaluation of his fitness to proceed.   On January 18, 1984, following examination by Dr. Harry Xanthopoulos, chief psychiatrist at the Montana State Hospital, and Dr. Roy Hamlin, psychologist, the court found defendant unfit to proceed to trial.

A second competency hearing was held on September 14, 1984.   Dr. William Stratford testified for the State.   Dr. Xanthopoulous and defendant's attorney John Riddiough testified for defendant.   The court found defendant competent and fit to proceed.

5

A three-week trial, held in April, 1985, resulted in a hung jury. A second trial, held from May 21 to June 5, 1985, resulted in defendant's conviction.

## Issue 1

Did the District Court err when it permitted defendant's attorney, John Riddiough, to testify at trial?

During the September 14, 1984, competency hearing, defendant's second court-appointed attorney, John Riddiough, called himself to the witness stand. Riddiough testified in narrative form that he had great difficulty communicating with defendant Statczar. Riddiough stated that defendant had told him three different alibis concerning his whereabouts during the night and early morning hours of October 15 and 16, 1983. Riddiough testified, "Statczar related to me that he had little or no recollections of giving the previous stories . . ." Riddiough also testified that Statczar did not appreciate the significance of the varying alibi stories:

> My impression was that he believed wholeheartedly in the story that he had given me. My impression was that he was not giving me a story to attempt to come up with a better alibi as it were. He gave me the impression that, frankly, he seemed surprised when I confronted him with the previous alibi stories.

During Riddiough's testimony, Statczar remained seated at defense counsel's table. Defendant was not called to testify and did not object to Riddiough's testimony.

During the second competency hearing on September 14, 1984, Dr. Xanthopoulos and Dr. Hamlin testified that Statczar was suffering from organic personality syndrome, that he had an IQ of 75, and that he was functioning at a "borderline level." When asked what a judge's role is at trial, Statczar

6

responded, "The judge is to wear a black robe and sit in front of the courtroom."

Riddiough withdrew as defense counsel following the District Court's finding that defendant was competent to stand trial. Riddiough was subsequently called to testify for the State. At trial, Riddiough testified that defendant had given three different statements concerning his whereabouts on the night and early morning of October 15 and 16, 1983. Riddiough testified that defendant made the following inconsistent statements: (1) that defendant went to a movie with his brother and sister-in-law in Missoula and (2) that he went to a birthday party with relatives in Ronan, and (3) that he stayed home alone in Charlo. During closing arguments, the State referred to Riddiough's testimony and argued that defendant had "lied" to his own attorney.

At trial, Riddiough was limited by the court to testifying that he had been defendant's court-appointed counsel and that defendant had made the above-mentioned inconsistent statements. The court prohibited defense counsel from asking, and Riddiough from responding to, questions which defendant contends would explain his inconsistent statements. The court prohibited Riddiough from testifying that his interviews with defendant took place in Warm Springs State Hospital, that Riddiough felt defendant was mentally deficient and unable to comprehend the proceedings and that Riddiough did not believe defendant was lying.

Defendant contends that Riddiough's testimony at the second competency hearing constituted a breach of his attorney-client privilege. The attorney-client privilege is defined in § 26-1-803, MCA:

> An attorney cannot, without the consent of his client, be examined as to any communication made by his client to him

7

or his advice given thereon in the
course of his professional employment.

A careful review of the record reveals that defense counsel Riddiough violated his confidential relationship with his client, Dale Statczar, when he offered testimony of Statczar's conflicting alibi statements. At the September 14, 1984, competency hearing, Riddiough called himself to the witness stand and stated: "I'm making this statement--because it is a breach of the attorney-client privilege--because I feel it is necessary to make this statement." Section 26-1-803, MCA, provides that an attorney cannot be examined regarding confidential communications made in the course of employment "without the consent of his client." Accordingly, only the client can waive the privilege. State v. Iwakiri (Id. 1984), 682 P.2d 571, 574. We find no evidence that defendant Statczar consented to Riddiough's voluntary disclosure of defendant's confidential statements.

The State contends that, by failing to object to Riddiough's testimony, defendant waived the attorney-client privilege. A client may waive the attorney-client privilege:

> If the client elicits testimony from the
> lawyer-witness as to privileged communi-
> cations this obviously would waive as to
> all consultations relating to the same
> subject, just as the client's own testi-
> mony would.

McCormick, Evidence § 93 at 225.

• Defendant claims that he did not waive his attorney-client privilege. Waiver is defined as the intentional or voluntary relinquishment of a known right or conduct which implies relinquishment of a known right. Kuiper v. District Court (1981), 632 P.2d 694, 698, 38 St.Rep. 1288. The burden of establishing waiver of the privilege is on the party seeking to overcome the privilege. Miller v. Dis. Ct.

8

City and Cty of Denver (Colo. 1987), 737 P.2d 834, 838. Two elements must be considered when a court reviews the waiver of an attorney-client privilege: (1) the element of a client's implied intention and (2) the element of fairness and consistency. See, 8 Wigmore, Evidence § 2327 at 636; State v. Balkin (Wash. 1987), 737 P.2d 1035, 1037.

An implied waiver must be supported by evidence showing that defendant, by words or by conduct, has impliedly forsaken his privilege of confidentiality with respect to the communication in question. Miller v. Dis. Ct., City and Cty of Denver, 737 P.2d at 838. The State has not provided this Court with evidence that defendant intended to waive his attorney-client privilege. Defendant did not testify in either competency hearing or in either trial. Defendant was not asked whether he waived his attorney-client privilege for the competency hearing or for all further judicial proceedings.

The second part of Wigmore's waiver test concerns consistency and fairness. We note that defendant Statczar had no prior contact with the judicial system. Given defendant's mental capacity and unfamiliarity with courtroom procedure, we hold it is inherently unfair to require the defendant, under the specific facts before us, to object to his attorney's testimony at the competency hearing in order to prevent his confidential statements from being used against him at trial. We note that at trial, defendant's newly court-appointed counsel strenuously objected to Riddiough's testimony.

We hold the following factors prejudiced defendant's right to a fair trial: (1) Riddiough's testimony of defendant Statczar's inconsistent statements was extremely prejudicial with limited probative value. Rule 403, M.R.Evid. (2) The State presented no evidence that Statczar intended to waive

9

his right not to divulge this privileged information. (3) Defendant's right against self-incrimination need not be surrendered in order to assert a statutory right. Section 46-14-103, MCA; Simmons v. United States (1968), 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259. We hold that fairness and consistency coupled with the lack of evidence that defendant intended to waive the privilege requires us to reverse defendant's conviction.

## Issue 2

Did the District Court violate defendant's right against self-incrimination when it permitted the State to call Dr. William Stratford to testify against defendant?

Defendant claims that his right against self-incrimination was violated when the court permitted the State to call Dr. William Stratford on rebuttal and allowed him to testify to statements made by defendant. The testimony in issue concerns defendant's recollection of events and defendant's factual understanding of the case. Stratford examined defendant on June 28, 1984, and on September 13, 1984. The State called Stratford to testify at defendant's second competency hearing on September 14, 1984, and at both of defendant's trials.

Article II, Sec. 26, 1972 Mont. Const., provides in pertinent part: "No person shall be compelled to testify against himself in a criminal proceeding."

At defendant's second trial, Dr. Stratford testified:

> Q. (By Ms. Townsend) What was he able to tell you, Doctor, with reference to [defendant's] knowledge of some of the kinds of evidence that had been collected in this investigation?
>
> Mr. Boggs: Objection, Hearsay, irrelevant.

10

The Court: Overruled.

A. [Defendant's] understanding, that is, what he portrayed to me, I can tell you. Whether it was truthful or not, of course, is for the jury to decide.

. . .

A. Okay. [Defendant] indicated there were particular kinds of automobiles, or a type of automobile involved. He indicated there was a particular kind of jacket that may be involved by the person who did this, that the individual involved had a colostomy bag, that there was a particular timing sequence, and that there will be a lineup, not a physical lineup, but as he referred to it, a photographic lineup. These were some of the factors that he indicated.

In its closing argument, the State referred to Stratford's testimony that defendant had knowledge of important and incriminating evidence.

Section 46-14-401, MCA, provides in pertinent part:

A _statement_ _made_ _for_ _the_ _purpose_ _of_ _psychiatric_ _examination_ or treatment provided for in this chapter by a person subjected to such examination or treatment _is_ _not_ _admissible_ _in_ _evidence_ _against_ _him_ _in_ _any_ _criminal_ _proceeding_ . . . _on_ _any_ _issue_ _other_ _than_ _that_ _of_ _his_ _mental_ _condition._ _It_ _is_ _admissible_ _on_ _the_ _issue_ _of_ _his_ _mental_ _condition,_ whether or not it would otherwise be considered a privileged communication, _unless_ _it_ _constitutes_ _an_ _admission_ _of_ _guilt_ _of_ _the_ _crime_ _charged._ [Emphasis added.]

Earlier we held that a defendant's admissions and confessions, when made as a privileged communication to a psychiatrist, are protected and therefore inadmissible. State v. Clark (Mont. 1984), 682 P.2d 1339, 1352, 41 St.Rep.

11

833, 848. At trial, Dr. Stratford was permitted to testify that defendant's mental capacity enabled him to recall certain elements of the State's case against the defendant. Stratford's testimony is generally admissible because defendant has placed his mental condition at issue. However, Stratford's testimony of defendant's recall of the incriminating evidence (automobile, jacket, colostomy bag) comes dangerously close to violating defendant's right against self-incrimination. See, § 46-14-401, MCA, and Article II, Sec. 26, 1972 Mont. Const.

Since we are reversing defendant's conviction due to a violation of defendant's attorney-client privilege, we are not required to decide this issue. However, we caution the District Court to refrain from admitting evidence of defendant's mental condition which implies or constitutes an admission of guilt of the crime charged. Section 46-14-401, MCA.

Issue 3

Does substantial evidence support the District Court's determination that defendant was mentally competent to proceed to trial?

Defendant contends the District Court abused its discretion when it determined defendant was fit to proceed to trial. Fitness to proceed is defined as:

> The test [is] whether the defendant has
> sufficient present ability to consult
> with his lawyer with a reasonable degree
> of rational understanding and whether he
> has a rational as well as a factual
> understanding of the proceedings against
> him.

12

State v. Austad (1981), 197 Mont. 70, 78, 641 P.2d 1373, 1378, citing Dusky v. United States (1960), 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825.

Section 46-14-103, MCA, provides:

> No person who, as a result of mental disease or defect, is unable to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures. [Emphasis added.]

Defendant contends "eyewitness identification, alibi and statements attributed to the defendant comprised the core of the [State's] case." In Austad, 197 Mont. at 79, 641 P.2d at 1378, we held that if physical evidence comprises the core of the State's case, defendant's fitness to proceed might hamper "preparation and preservation of the defense." Therefore, defendant argues his defense was clearly hindered by his lack of fitness to assist and prepare his defense. Defendant cites testimony of John Riddiough, Dr. Henry Xanthopoulos, Dr. Roy Hamlin and Dr. William Stratford.

At the second competency hearing on September 14, 1984, Dr. Stratford testified in detail about his methods of evaluation and basis for his determination that defendant was fit to proceed to trial. Dr. Stratford reviewed the allegations made against the defendant, police reports concerning the nature of the crime charged, information he had received from the Montana State Hospital at Warm Springs and hospital record from St. Patrick's Hospital regarding defendant's motorcycle accident. Dr. Stratford concluded that defendant Statczar was capable of understanding the proceedings against him and of assisting in his own defense.

Dr. Xanthopoulos testified at the second competency hearing that defendant suffers from a "serious mental defect,

13

Organic Personality Syndrome." He also testified that defendant may have suffered brain damage following his motorcycle accident in 1979 and stated that defendant performs at a "borderline level" of intelligence. Dr. Hamlin's testimony closely followed the testimony of Dr. Xanthopoulos.

As stated earlier, John Riddiough, defendant's court-appointed attorney offered testimony that defendant was unable to understand the judicial proceedings. As evidence of defendant's mental incompetency, Riddiough also testified that defendant had given three inconsistent alibi statements.

Fitness to proceed to trial is a matter largely within the discretion of the District Court. Sections 46-14-202 through -222, MCA. Therefore, we will not overturn a decision of the District Court in the absence of a clear abuse of discretion. The evidence may conflict, but it is substantial if any reasonable trier of fact could rely upon the evidence in support of its conclusion. State v. Hall (1983), 203 Mont. 529, 533, 662 P.2d 1306, 1308.

At the second competency hearing the State and defendant presented conflicting evidence of Statczar's fitness to proceed. The District Court heard the evidence and chose to adopt the State's position. The record reveals that substantial credible evidence supports the finding of the District Court. Accordingly, we hold the District Court properly determined that defendant was fit to proceed to trial. Section 46-14-103, MCA.


Issue 4

Did the District Court err when it denied defendant's motion for a mistrial based on improper prosecutorial comments during closing argument?

Following the State's closing arguments defendant moved for a mistrial alleging prosecutorial misconduct. The

District Court denied defendant's motion. During closing argument the State argued that its office was too busy to prosecute innocent persons: "We don't have to do that, ladies and gentlemen. We do have 1,450 cases a year in the county attorney's office. We don't have time to spend chasing people that we believe are innocent or [have time] to frame people."

We disapproved an attorney's assertion of a personal opinion in State v. Armstrong (1980), 189 Mont. 407, 427, 616 P.2d 341, 352. Because defendant has not provided this Court with evidence of undue prejudice, we hold the District Court properly denied defendant's motion for a new trial. However, we caution the State to refrain from utilizing the above-mentioned trial tactic.

We reverse defendant's conviction and remand to the District Court for further proceedings.

_____
Chief Justice

We concur:

_____
_____
_____
_____
_____
_____
Justices

15